## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**GARY L. WORKMAN**                                       **CIVIL ACTION**

**VERSUS**                                                      **NO.  18-13175**

**JASON KENT, WARDEN**                         **SECTION "H"(2)**

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary.  See 28 U.S.C. § 2254(e)(2).[1]  For the following reasons, I recommend that the instant petition for habeas corpus relief be **DENIED** and **DISMISSED WITH PREJUDICE**.

---

[1]Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination.  Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

I.    STATE COURT PROCEDURAL BACKGROUND

The petitioner, Gary L. Workman, is incarcerated in the Dixon Correctional Institute in Jackson, Louisiana.[2]  On June 5, 2012, Workman was charged by bill of information in Jefferson Parish with one count of attempted aggravated rape of a twelve year old juvenile in violation of La. Rev. Stat. § 14:27 and § 14:42.[3]  On July 19, 2012, the State filed an amended bill of information adding three counts of distribution and one count of possession of pornography involving juveniles under the age of thirteen in violation of La. Rev. Stat. § 14:81.1.[4]  On January 25, 2014, the bill was amended to correct the dates related to the child pornography counts.[5]  The Louisiana Fifth Circuit Court of Appeal summarized the facts determined at trial as follows in relevant part:

> Detective Jessica Cantrell Zuppardo of the Kenner Police Department testified that an anonymous tip was reported to her office concerning an advertisement published on the online website "Craig's List."  Detective Zuppardo testified that the advertisement was found in the personal section, under "Casual Encounters," and was titled "Somebody's Daughter."  After clicking on the title, the content of the advertisement read: "[e]very woman is somebody's daughter.  Do you have a daughter you could bring to me?  I'd love to do somebody's daughter."  Based on the language used in the advertisement, Detective Zuppardo contacted Special Agent Jamie Hall of the Federal Bureau of Investigations (FBI), who took over the investigation.  Detective Zuppardo testified that she again became involved in the investigation when Agent Hall set up "a meet" with defendant in April of 2012.  Detective Zuppardo explained that Agent Hall had arranged for defendant to meet, what defendant believed to be, a twelve-year-old girl to have sex with at a specified

---

[2]Record Doc. No. 3.

[3]State Record Vol. 1 of 12, Bill of Information, 6/5/12.

[4]State Record Vol. 1 of 12, Amended Bill of Information, 7/19/12.

[5]State Record Vol. 1 of 12, Second Amended Bill of Information, 2/25/14.

location in Kenner. Detective Zuppardo and Agent Hall set up surveillance near 2850 Idaho Avenue—the apartment complex address defendant was provided, and waited for defendant to arrive. Detective Zuppardo testified that Special Agent Tim Lucas followed defendant when defendant left his residence. Defendant's vehicle proceeded down Idaho Avenue at which time a traffic stop was effectuated in front of the apartment complex by Kenner Police Officer Ethan Hales. Defendant was placed in custody and an inventory search of his vehicle was performed. Inside his vehicle a post-it note, which had the address of the apartment complex on Idaho Avenue written on it, was tom in half and recovered from the passenger side floorboard.

Defendant was transported to the Kenner Police Department where he was interviewed by Detective Zuppardo and Agent Hall. Prior to interviewing defendant, Detective Zuppardo testified that defendant was read his <u>Miranda</u>[1] rights from an Advice of Rights Form, which defendant signed, waiving his rights. Detective Zuppardo stated that she did not force, coerce or promise anything to defendant in exchange for his statement. She further stated that Agent Hall also provided defendant with an FBI Advice of Rights Form. Detective Zuppardo explained that Agent Hall, as the primary interviewer, asked the questions during the interview while she took notes. She testified that during the interview defendant admitted to posting the reported advertisement on Craig's List and further admitted to having contact with a man by the name of "Savage" who was actually undercover Special Agent Hall. Defendant also admitted to sending a picture of his niece getting out of the shower and other child pornography via email to Agent Hall. Defendant stated that he used the directions provided by Agent Hall to drive to the apartment complex on Idaho Avenue with the intent of trying to have sex with a twelve-year-old girl. Specifically, defendant stated "[i]f I couldn't have sexual intercourse, then I wouldn't want to do anything else with the girl." Defendant admitted to owning a personal computer and admitted to having sent child pornography through several different sources in the past. He further stated that at one time, he attempted to make contact with an eleven-year-old girl through a man named "Ron Anderson," who had previously sent defendant child pornography.

[1]<u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Special Agent Jamie Hall of the FBI testified that he was contacted by Detective Zuppardo concerning an anonymous tip reported to the Kenner Police Department regarding a posting on Craig's List. Agent Hall testified that he investigated the posting further because he believed that the person who posted the advertisement was looking for someone under the age of sixteen based on the phrase "a daughter you could bring to me," implying the daughter would not be of driving age. Through the link provided in the advertisement, Agent Hall replied to the post using the moniker "Savage." The person replied back to Agent Hall using the moniker "Kyabeah." Agent Hall testified that the email communications between the two of them lasted approximately one month, and included the transmittal of several images he deemed to be child pornography.

Agent Hall explained in detail his email conversations with defendant. He testified that he initiated contact with defendant by responding to his post with the following: "what are you looking for, in particular? I may have something." Eventually, over the course of several email correspondences, Agent Hall testified that defendant confirmed his intent by stating, "[a] guy I met online was wanting me to break in his 11–year old daughter. Something like that?"[2] When asked what happened with the eleven-year-old, defendant replied that he would have "gone through with it," but the person stopped communicating. Defendant then asked Agent Hall, "[s]o you got someone we can ... you know?" Due to the sexual nature of the previous email correspondences, Agent Hall explained that he believed defendant was requesting that he provide him with a minor to have sex with. Thus, Agent Hall responded that he "might have access to a 12–year–old girl," and later inquired as to what defendant would want to do to her. Defendant responded with his intent to have oral and vaginal sex with the minor. Specifically, defendant stated that he wanted to "lick her little c* *t then have her suck me, then cum inside her p* * *y." Agent Hall then asked defendant if he had any pictures or videos from other similar "escapades" to which defendant replied, "[n]ot on my own. Some a guy sent me." Throughout their correspondence, Agent Hall testified that in total, defendant sent him five emails containing various images: one depicting a clothed juvenile, one depicting a naked juvenile from behind (sent twice), and three PDF images containing two pictures each of child pornography. In later correspondence, defendant emailed Agent Hall stating, "I think I remember you saying you may has (sic) access to a 12–year old."[3] Facilitating defendant's opportunity for him to act on his intent, Agent Hall responded, "[i]ndeed, I do have access to have a 12–year old." Defendant then replied, "[y]ou share?" to which Agent Hall posed the question, "videos?" Defendant responded, "[w]ell that, too. I was talking about sharing the 12–year–old" and "does she like you doing her, or is it something forced on her?" Defendant later stated, "would you like to watch me f* * * her?" prompting Agent Hall to respond, "[y]our call on that." Defendant then questioned, "[w]ould she let me? When can we do it?" and provided his dates of availability.

[2]At this point, an administrative subpoena was obtained to secure defendant's IP address so that his physical location could be identified. The administrative subpoena was returned, identifying defendant and his location where FBI agents were sent to conduct surveillance.

[3]A search warrant was prepared based on these images. Additionally, the image of the nude female juvenile, facing away from the camera, and two of the three PDF images were later recovered from defendant's computer.

A time and date were arranged and defendant was provided the address to an apartment complex located at 2850 Idaho Avenue, apartment 211. Defendant was apprehended in front of the designated meeting location and transported to the Kenner Police Department where he provided a statement. Agent Hall confirmed that defendant was read his <u>Miranda</u> rights twice, both by Detective Zuppardo and himself, and that defendant waived them prior to giving his statement. Agent Hall testified that prior to the interview he informed defendant that federal law prohibits

lying to a federal agent during a federal investigation. Defendant then proceeded to tell Agent Hall that he went to the address on Idaho Avenue to meet someone by the name of "Savage," whom he believed was offering him a twelve-year-old girl to have sex with; however, he further stated that he intended on calling the police when he arrived if the invitation turned out to be true. Once confronted with portions of the email correspondences between himself and "Savage," defendant admitted to posting the Craig's List advertisement and communicating with a man named "Savage" whom he believed lived in the apartments on Idaho Avenue and to whom he sent six child pornographic images to. He admitted that one of the photographs was of his niece getting out of the shower, and one of the images was of a young girl lying on her back with an adult male ejaculating on her.

Defendant further confessed that he went to the apartment complex on Idaho Avenue to have sex with a twelve-year-old female and that he was planning on going through with it but that if he could not "get it up he would have left and done nothing else." He explained that he wrote down the Idaho Avenue address on a post-it note which was on the floorboard of his truck. He also stated that he had sent child pornography to more than one person on previous occasions. Defendant further indicated that he had been in contact with a person named Ron Anderson who had an eleven-year-old girl that he was trying to get defendant in touch with for the purpose of having sexual intercourse. At the end of the interview, defendant stated that he wanted to "veer away from becoming a pedophile" and begged Agent Hall and Detective Zuppardo to let him go, promising that he would never do it again.

Agent Hall testified that a federal search warrant was issued for defendant's residence and upon execution of the warrant, defendant's computer was seized. The images found on defendant's computer were forwarded to the National Center for Missing and Exploited Children who identified at least three of the minor victims in the images.

Special Agent Timothy Lucas of the FBI testified that he conducted surveillance on defendant and reported to Agent Hall when defendant was en route to the designated meeting place. Agent Lucas testified that defendant left his residence approximately five minutes after the meeting location was provided to him. He further testified regarding the route used by defendant to get to the specified location, which was approximately five miles from defendant's residence. After defendant was stopped in front of the meeting location, Agent Lucas, pursuant to a search warrant, performed a search of defendant's residence from which a computer and scanner were seized.

Computer forensic examiner expert Special Agent Lawrence Robinson of the FBI testified regarding the evidence he obtained from a "USB thumb drive" and a hard drive from the "Compaq computer" seized from defendant's residence. He testified that he processed the content of the seized evidence into a "user-friendly format" so Agent Hall could review the material and "bookmark" the information pertinent to the investigation. Agent Robinson then drafted a report with the bookmarked information found to be relevant by Agent Hall. The pertinent images

found on defendant's hard drive were described and shown to the jury.  Agent Robinson further testified that the computer user name used to view and/or generate the images was "Kyabeah."  Agent Robinson confirmed that several of the images at issue were scanned onto defendant's computer in March of 2012.

Defendant testified that in 2012, he was conducting research on human behavior.  While researching, he responded to a "chat" from someone using the moniker "Koala 211" or "215" from New Zealand.  He testified that the man sent him icons, which he saved to his computer, not knowing their content.  Once he opened the images and discovered they contained child pornography, he stated that he deleted them.  Sometime later, while conducting maintenance on his computer, he learned that the images still existed.  He testified that he attempted to permanently delete the photographs but that they reappeared.  At some point, he downloaded the photographs, printed them, and re-submitted them under a new file named "Koala New."  He testified that he was told that if a file is renamed, it can then be permanently deleted.  He believed the images were finally deleted when he received a message that stated, "file no longer exists."  Defendant denied that he was into child pornography and stated that he has never purchased child pornography magazines or videos.

Defendant testified that he posted an advertisement on Craig's List as part of his behavioral research.  He explained that the posting was intended to attract adults and that he never intended to attract a child.  He stated that he received a few responses to the posting, including one from "Ron Anderson" and another male, "Endavin,"[4] who told defendant that he had been molested by his brother.  Defendant met Endavin in person who relayed his history of sexual abuse to defendant.  Three weeks later, he stated that he learned from Endavin that there were children being abused in "New Denham Springs," Louisiana.  He testified that he also received another response to his posting by someone named "Savage," who at the time he believed was connected to "Endavin" and might have been the same person he had had previous contact with (who's moniker was "Seattle 038 a/k/a Hot Tot Boy"), and who defendant knew to be into child pornography.

[4]Endavin responded to a different posting by defendant under the title "[s]omething taboo."

Defendant testified that his intent in responding to Savage was to find out if "Savage" was the same person as "Seattle 038."  In order to gain the confidence of "Savage," defendant explained that he sent a photograph of a girl in clothing.  He testified that he could not explain how the photographs he received from "Koala" containing the child pornographic images were sent to "Savage" because he did not remember sending them, and thought that they could not be sent because they had been deleted.  Defendant admitted to sending photographs of adult women to "Savage."  He further denied having the intent to have sex with a twelve-year-old girl when he went to the address on Idaho Avenue.  He stated that his intent was to see if the address was real and did not plan to stop or go inside.  He testified that he

was afraid that "Savage" was molesting children and did not want to "falsely accuse anyone" so he wanted to verify the address before reporting "Savage" to the police.

Defendant testified that he attempted to explain the situation to Agent Hall but was told, on two occasions, that it is a federal crime to lie to a federal agent. He denied admitting that he intended on going to the address to have sex with a twelve-year-old. He also denied intentionally intending to distribute child pornography.

State v. Workman, 170 So.3d 279, 283–87 (La. App. 5th Cir. 2015); State Record Volume 6 of 12, Louisiana Fifth Circuit Court of Appeal Opinion, 14-KA-559 at pp. 4–12, April 15, 2015.

Defense counsel filed a motion to suppress petitioner's statement on June 12, 2012.[6] Workman filed a similar pro se motion to suppress his statement on March 26, 2013.[7] A hearing was held on February 25, 2014, after which the trial court denied both motions to suppress.[8]

Workman was tried before a jury on February 26 through 27, 2014 and was found guilty of all five counts.[9] On March 6, 2014, petitioner filed a motion for new trial.[10] On

---

[6]State Record Vol. 1 of 12, Omnibus Motions and Order for Pre-Trial Motions, 6/12/12.

[7]State Record Vol. 1 of 12, Pro Se Omnibus Motions and Order for Pre-trial Motions, 3/26/13.

[8]State Record Vol. 1 of 12, Trial Minutes, 2/25/14; State Record Vol. 5 of 12, Hearing Transcript, 2/25/14.

[9]State Record Vol. 1 of 12, Trial Minutes, 2/25/14; Trial Minutes, 2/26/14; Trial Minutes, 2/27/14; Verdict, 2/27/14; State Record Vol. 5 of 12, Trial Transcript, 2/26/14; State Record Vol. 6 of 12, Trial Transcript (con't), 2/26/14; Trial Transcript, 2/27/14; State Record Vol. 3 of 12, Opening Statements Transcript, 2/26/14.

[10]State Record Vol. 1 of 12, Motion for New Trial, 3/6/14.

March 10, 2014, the state trial court denied the motion and sentenced Workman to fifteen years in prison as to count one; ten years in prison as to counts two, three and four; and five years in prison as to count five, with counts one through four to be served consecutively and count five to be served concurrently, for a total of forty-five (45) years at hard labor and without the benefit of parole, probation or suspension of sentence.[11]

On direct appeal to the Louisiana Fifth Circuit, Workman's appointed counsel asserted three errors: (1) The trial court erred in denying his motion to suppress his statement. (2) The evidence was legally insufficient to convict him. (3) The trial court imposed an excessive sentence.[12] On February 17, 2015, Workman filed a pro se brief again claiming that the trial court erred in failing to suppress his statement and asserting three additional errors: (4) Prosecutorial misconduct should have resulted in a mistrial. (5) The trial court should have found entrapment. (6) The trial court erred in instructing the jury regarding attempt.[13] Workman filed a second pro se brief on February 28, 2015.[14] On April 15, 2015, the Louisiana Fifth Circuit affirmed the convictions and sentences, finding the alleged prosecutorial misconduct waived and the remaining claims

---

[11]State Record Vol. 1 of 12, Sentencing Minutes, 3/10/14; Commitment Order, 3/10/14; State Record Vol. 6 of 12, Sentencing Transcript, 3/10/14.

[12]State Record Vol. 6 of 12, Appellant Brief, 2014-KA-0559, 10/27/14.

[13]State Record Vol. 6 of 12, Pro Se Appellant Brief, 2014-KA-0559, 2/23/15 (dated 2/17/15).

[14]State Record Vol. 6 of 12, Pro Se Supplemental Appellate Brief, 14-KA-559, 3/5/15 (dated 2/28/15).

without merit, but remanding the case for the Uniform Commitment Order to be corrected to reflect the correct adjudication date and the dates of the offenses for counts two, three and four.[15]  The trial court amended the Uniform Commitment Order as directed on April 15, 2015.[16]  The Louisiana Supreme Court denied Workman's related writ application without stated reasons on March 24, 2016.[17]

Workman's conviction became final on June 22, 2016, ninety (90) days after the Louisiana Supreme Court denied his first writ application, which is when the time expired for Workman to file a petition for writ of certiorari with the United States Supreme Court.  Roberts v. Cockrell, 319 F.3d 690, 694 (5th Cir. 2003) (citing 28 U.S.C. § 2244(d)(1)(A); Flanagan v. Johnson, 154 F.3d 196, 200–01 (5th Cir. 1998)); Ott v. Johnson, 192 F.3d 510, 513 (5th Cir.1999) (citing 28 U.S.C. § 2244(d)(1)(A)); U.S. Sup. Ct. R. 13(1).

On November 15, 2016, Workman filed an application for post-conviction relief with counsel, in which he asserted the following claims: (1) ineffective assistance of counsel for failing to investigate, present a defense, adequately prepare for trial and provide copies of essential reports to Workman prior to trial; and (2) ineffective

---

[15]State v. Workman, 170 So. 3d 279 (La. App. 5th Cir. 2015); State Record Vol. 6 of 12, 5th Cir. Opinion, 14-KA-559, 4/15/15.

[16]State Record Vol. 1 of 12, Minutes, 4/15/15; Amended Uniform Commitment Order, 4/15/15.

[17]State v. Workman, 190 So. 3d 1189 (La. 2016); State Record Vol. 12 of 12, La. S. Ct. Order, 2015-KO-0909, 3/24/16; Supplement, 15 KO 909, 5/26/15 (dated 5/15/15).

assistance of appellate counsel for failing to assign as error admission of inadmissible evidence at trial.[18]  The state trial court dismissed the application without prejudice for failure to use the mandatory uniform application.[19]  Workman, through counsel, refiled his application on December 15, 2016.[20]  The state trial court denied relief on February 1, 2017, finding no merit to his ineffective assistance of counsel claims.[21]

On July 14, 2016, the Louisiana Fifth Circuit denied Workman's writ application filed with counsel, finding no merit to his ineffective assistance of counsel claims.[22]  On October 29, 2018, the Louisiana Supreme Court denied Workman's writ application, finding that he had failed to show ineffective assistance of trial and appellate counsel under Strickland v. Washington, 466 U.S. 668 (1984).[23]  On October 29, 2018, the

---

[18]State Record Vol. 1 of 12, Application for Post Conviction Relief, 11/15/16; St. Rec. Vol. 2 of 3, Application for Post Conviction Relief (con't), 11/15/16; St. Rec. Vol. 3 of 12, Application for Post Conviction Relief (con't), 11/15/16.

[19]State Record Vol. 3 of 12, Trial Court Order, 11/29/16.

[20]State Record Vol. 3 of 12, Application for Post Conviction Relief, 12/15/16.

[21]State Record Vol. 3 of 12, Trial Court Order, 2/1/17.

[22]State Record Vol. 8 of 12, Fifth Circuit Order, 17-KH-134, 4/4/17; 5th Cir. Writ Application, 17-KH-134, 3/3/17.

[23]State v. Workman, 255 So.3d 579 (La. 2018) (per curiam); State Record Vol. 10 of 12, La. S. Ct. Order, 2017-KP-0716, 10/29/18; La. S. Ct. Writ Application, 5/2/17.

Louisiana Supreme Court declined to consider Workman's pro se writ application, finding it not timely filed pursuant to La. S.Ct. R. X § 5.[24]

In the interim, Workman filed a motion for concurrent and coterminous judgments, which was denied on June 12, 2017.[25]  He also filed a motion to correct an indeterminate sentence, but the record does not include the disposition of that motion.[26]

## II.    FEDERAL HABEAS PETITION

### (A)    Background

On December 13, 2018, the clerk of this court filed Workman's petition for federal habeas corpus relief in which he asserts the following grounds for relief: (1) The trial court erred in denying his motion to suppress his statement.  (2) Insufficient evidence supports his convictions.  (3) The State committed prosecutorial misconduct.  (4) He received ineffective assistance of trial counsel for failing to (a) investigate the case; (b) subpoena an expert in computer forensics and Workman's siblings; (c) provide Workman with vital documents during and prior to trial; (d) file pretrial motions to quash, to suppress the evidence and to compel the State to produce proof of the complaint or tip

---

[24]State ex rel. Workman v. State 254 So.3d 697 (La. 2018); State Record Vol. 10 of 12, La. S. Ct. Order, 2017-KH-0985, 10/29/2018.La. S. Ct. Writ Application, 17 KH 985, 6/12/17 (dated 5/16/17).

[25]State Record Vol. 3 of 12, Motion for Concurrent and Coterminous Judgments, 6/1/17 (dated 5/26/17); Trial Court Order, 6/12/17.

[26]State Record Vol. 1 of 12, Motion to Correct an Indeterminate Sentence Pursuant to La.C.Cr.P. art. 879, 12/10/18.

and the e-mail about the eleven-year-old in Mississippi; (e) request <u>Brady</u> evidence; (f) object to illegally obtained inadmissible evidence; and (g) challenge the "fake" file sent by Agent Hall to Workman.  (5) He received ineffective assistance of appellate counsel for failing to assign as error the introduction of evidence relating to erotic images.  (6) The trial court erred in holding as a matter of law that there was no entrapment.[27]

The State filed an answer in response to Workman's petition in which it concedes that the federal petition is timely and that Workman exhausted all of his claims.[28]  The State argues that Workman's third claim is procedurally barred and the remaining issues are without merit.

(B)    <u>Petitioner's Preliminary Motions</u>

Workman filed several motions seeking discovery and a more definite statement.[29] On May 14, 2019, I denied his request for a more definite statement and dismissed without prejudice as premature petitioner's requests for discovery and production of exhibits.[30]  Having fully reviewed the record, I find that discovery and further production of the state court record is not warranted for the following reasons.

---

[27]Record Doc. No. 3.

[28]Record Doc. No. 12.

[29]Record Doc. Nos. 9, 14, 15 and 16.

[30]Record Doc. No. 17.

As an initial matter, Workman seeks discovery of stored electronic communications related to this case.[31]  Workman claims there are missing e-mails and evidence, particularly e-mails relating to an eleven-year-old girl in Mississippi who was allegedly being sexually abused.  He also seeks a copy of the affidavit and order allowing electronic surveillance under La. Rev. Stat. § 15:1310.  In addition, he seeks documentation supporting law enforcement personnel's claim that they received an anonymous tip about an advertisement on Craig's List which led them to discover Workman's advertisement.

Workman's filings show that he made multiple requests for documents pursuant to the Freedom of Information Act.[32]  Petitioner admits that, in response to his requests, the Federal Bureau of Investigation provided him with one hundred and twenty (120) pages of its one hundred and sixty-nine (169) page file, apparently withholding forty-nine (49) pages under 5 U.S.C. §§ 552(a) and (b).[33]  Workman further concedes that his representative was able to review and retrieve copies of documents from the Jefferson Parish District Attorney's Office file and that he received e-mail evidence, although the evidence did not include an e-mail about the eleven-year-old girl.[34]  In a written response

---

[31]Record Doc. Nos. 9 and 14.

[32]Record Doc. No. 9-1 at pp. 2–8, 10–35.

[33]Id. at p. 8.

[34]Id. at pp. 18, 20.

to one of his records requests, the Louisiana Department of Justice stated that, "[a]fter a diligent search, our office has been unable to locate any records pertaining to your inquiry"for "a copy of the affidavit and application for the order authorizing or approving the interception of any wire, electronic, or oral communication and the district attorney's report to the attorney general and the attorney general's report to the judicial administrator" of the [Louisiana] [S]upreme [C]ourt for "electronic surveillance."[35]

La. Rev. Stat. § 15:1310, Louisiana's Electronic Surveillance Act ("the Act"), which sets out the procedures law enforcement must follow to judicial authorization of electronic surveillance, also known as a wiretap, has no application to this case because there was no interception of electronic or wire communications. Agent Hall, working in an undercover capacity, and Workman communicated via e-mail. Therefore, judicial authorization under the Act was not required and, as Workman has already been advised, neither an affidavit seeking authorization nor an order granting authorization to conduct electronic surveillance exists. After Workman was arrested, a search warrant was obtained to search Workman's residence, and his computer was seized. The warrant and the supporting affidavit are part of the state court record and copies were attached as an exhibit to Workman's state application for post-conviction relief.[36]

---

[35]Id. at p. 34.

[36]State Record Vol. 1 of 12, State Record Vol. 1 of 12, Application for Post Conviction Relief, Exhibit 6, 11/15/16.

While Workman seeks documentary evidence demonstrating that law enforcement received a call about his Craig's List advertisement, nothing in the record supports a finding that such evidence exists. What does not exist cannot be produced. Detective Zuppardo[37] testified that Kenner Police Department Headquarters received an anonymous tip from a concerned citizen concerning a Craig's List advertisement that the person felt should be investigated.[38] Zuppardo did not personally receive the call, but she was informed of it, and, since the caller wished to remain anonymous and did not want to make a report, she did not know the name of the caller.[39] Agent Hall testified that Detective Zuppardo told him she received a complaint about a Craig's List advertisement and that "someone called in and wanted law enforcement to look into the matter."[40] There is no evidence that the anonymous tip was actually documented in a report or that any such report was withheld from pretrial discovery.

---

[37] The opinion of the Louisiana Fifth Circuit Court of Appeal, cited above, refers to Detective Jessica Cantrell Zuppardo as Detective Zuppardo. The state trial court transcript consistently makes reference to Detective Cantrell. Detective Zuppardo and Detective Cantrell are the same person. For purposes of this opinion, Detective Jessica Cantrell Zuppardo will be referred to as Detective Zuppardo.

[38] State Record Vol. 5 of 12 at pp. 12–13, Trial Transcript, 2/26/14.

[39] Id. at p. 14.

[40] State Record Vol. 5 of 12, Preliminary Hearing Transcript at p. 5, 5/24/12; Trial Transcript at p. 134, 2/24/14.

For the foregoing reasons, Workman's motion for production of electronically stored communications, Record Doc. No. 9, and motion for leave to request discovery, Record Doc. No. 14, are DENIED.

Workman's remaining motions seek the state court record filed by the State with its response to his petition, together with any exhibits and an index.[41]  Workman claims he cannot adequately prepare a traverse without these documents, including the complete trial and related transcripts.

The State filed a twelve (12) volume state court record in response to my December 14, 2018 order.[42]  The state court record is produced to the court separately under separate cover and is not an attachment to the State's answer.  In its response, the State did not cite any portions of the state court record, other than the opinions and orders of the state trial court, the Louisiana Fifth Circuit and the Louisiana Supreme Court,[43] all of which Workman attached as exhibits to his habeas petition.[44]  The State's response included no exhibits.[45]  Thus, Workman already has everything in the record relied upon or cited by the State.  He has not shown that he is entitled to a copy of the entire state

---

[41]Record Doc. Nos. 15-16.

[42]Record Doc. No. 3.

[43]Record Doc. No. 12.

[44]Record Doc. Nos. 3-3 at pp. 41–60; 3-4 at pp. 8, 39; 3-5at pp. 3–4, 40–41, 71–72, 73–75.

[45]Record Doc. No. 12.

court record filed with the court, and his motions, Record Doc. Nos. 15 and 16, are therefore DENIED.[46]

## III.    GENERAL STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254. The AEDPA went into effect on April 24, 1996, and applies to habeas petitions filed after that date.[47] Flanagan v. Johnson, 154 F.3d 196, 198 (5th Cir. 1998) (citing Lindh v. Murphy, 521 U.S. 320 (1997)). The AEDPA therefore applies to Workman's petition, which, for reasons discussed below, is deemed filed in a federal court on December 6, 2018.[48]

---

[46]The state court record does not include an index and no index was required by the court. While a copy of the trial court docket master is included, Workman previously paid for and received a copy of it. State Record Vol. 1 of 12, Letter, 7/16/14 (dated 6/17/14); Response to Request for Information and/or Documents, 7/17/14. The record demonstrates that Workman was permitted to review the entire trial court record to search for errors before he filed his two pro se briefs on direct appeal. State Record Vol. 6 of 12, 5th Cir. Protective Order, 14-KA-559, 12/18/144; 5th Cir. Order, 14-KA-559, 1/28/15. Workman's state court application for post-conviction relief, filed with the counsel's assistance, included 76 pages of discovery, the trial transcripts and a transcript from a hearing held on May 23, 2013. State Record Vol. 1 of 12, Application for Post Conviction Relief, 11/15/16; State Record Vol. 2 of 3, Application for Post Conviction Relief (con't), 11/15/16; State Record Vol. 3 of 12, Application for Post Conviction Relief (con't), 11/15/16. Workman was represented by counsel at all times until the filing of his federal habeas petition and it is clear that his counsel possessed copies of the state court record, the District Attorney's file, and the non-protected portions of the Federal Bureau of Investigation file.

[47]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. United States v. Sherrod, 964 F.2d 1501, 1505 (5th Cir. 1992).

[48]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se. Under this rule, the date when prison officials receive the pleading from the inmate for

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether petitioner's claims were adjudicated on the merits in state court; i.e., the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.  Nobles v. Johnson, 127 F.3d 409, 419–20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).  The State concedes and I find that Workman's petition was timely filed.  The State has asserted the defense of procedural default based on the presentation and disposition of his third claim in the state courts.

IV.    EXHAUSTION DOCTRINE AND PROCEDURAL DEFAULT

"A fundamental prerequisite to federal habeas relief under § 2254 is the exhaustion of all claims in state court prior to requesting federal collateral relief."  Whitehead v. Johnson, 157 F.3d 384, 387 (5th Cir. 1998) (citing Rose v. Lundy, 455 U.S. 509, 519–20 (1982)); accord Preiser v. Rodriguez, 411 U.S. 475, 500 (1973); Nobles, 127 F.3d at 419. "A federal habeas petition should be dismissed if state remedies have not been exhausted as to all of the federal court claims."  Whitehead, 157 F.3d at 387 (citing 28 U.S.C. § 2254(b)(1)(A); Rose, 455 U.S. at 519–20) (emphasis added).

---

delivery to the court is considered the time of filing for limitations purposes.  Coleman v. Johnson, 184 F.3d 398, 401 (5th Cir. 1999), cert. denied, 529 U.S. 1057 (2000); Spotville v. Cain, 149 F.3d 374, 378 (5th Cir. 1998); Cooper v. Brookshire, 70 F.3d 377, 379 (5th Cir. 1995).  The clerk of court filed Workman's federal habeas petition when the filing fee was received on December 13, 2018.  Workman certified under penalty of perjury that he placed his original pleadings into the prison mail system on December 6, 2018.  The fact that he paid the filing fee on a later date does not alter the application of the federal mailbox rule to his pro se petition.  See Cousin v. Lensing, 310 F.3d 843, 847 (5th Cir. 2002) (mailbox rule applies even if inmate has not paid the filing fee at the time of mailing) (citing Spotville, 149 F.3d at 378).

"The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the <u>highest</u> state court." <u>Id.</u> (citing <u>Picard v. Connor,</u> 404 U.S. 270, 275–78 (1971)) (emphasis added). "State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," including discretionary review when that review is part of the State's ordinary appellate review procedures. <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999); <u>accord Duncan v. Walker</u>, 533 U.S. 167, 177–79 (2001).

"A federal court claim must be the 'substantial equivalent' of one presented to the state courts if it is to satisfy the 'fairly presented' requirement." <u>Whitehead</u>, 157 F.3d at 387 (citing <u>Picard,</u> 404 U.S. at 275–78). "This requirement is not satisfied if the petitioner presents <u>new legal theories</u> or <u>new factual claims</u> in his federal application." (emphasis added) <u>Id.</u> (citing <u>Nobles</u>, 127 F.3d at 420). It is not enough for a petitioner to raise the claims in the lower state courts, if they were not also specifically presented to the Louisiana Supreme Court. <u>See</u> <u>Baldwin v. Reese</u>, 541 U.S. 27, 32 (2004) (a prisoner does not fairly present a claim to a state court if that court must read beyond a petition or brief, such as a lower court opinion, to find the claim).

A.    <u>FAILURE TO EXHAUST</u>

To exhaust review of his claims in the state courts, Workman must have fairly presented the same claims and legal theories he urges in the instant petition to this federal court to the state courts in a procedurally proper manner and have given all appropriate state courts an opportunity to address each of his claims, either on direct appeal or in post-conviction proceedings through the Louisiana Supreme Court. In this case, the State concedes and I find that Workman has exhausted state court review of some of his claims. However, for the reasons that follow, Workman has defaulted any review of five portions of his ineffective assistance of trial counsel claims and his claims are considered technically exhausted.

Workman has asserted multiple grounds for relief related to his claim of ineffective assistance of trial counsel. The State claims that Workman properly exhausted his claims of ineffective assistance of trial counsel. Having reviewed Workman's application for post-conviction relief and his writ applications filed in the Louisiana Fifth Circuit Court of Appeal and the Louisiana Supreme Court, I find that Workman failed to exhaust review in a procedurally proper manner of five portions of his ineffective assistance of counsel claims concerning failure to present the testimony of his siblings at trial, file pretrial motions, request Brady evidence, object to illegally obtained inadmissible evidence and challenge the "fake" file sent by Agent Hall to Workman.

To the extent this differs from or exceeds the defense asserted by the State, I raise the issue of exhaustion in part sua sponte.  Accordingly, **petitioner is hereby specifically instructed that this report and recommendation is notice to him that this court is addressing the issue of failure to exhaust state court remedies and that petitioner must submit any evidence or argument concerning exhaustion as part of any objections he may file to this report**.  See Kurtzemann v. Quarterman, 306 F. App'x 205, 206 (5th Cir. 2009) (district court may sua sponte raise failure to exhaust, and notice of and an opportunity to respond to the exhaustion issue must be given) (citing Day v. McDonough, 547 U.S. 198, 209–10 (2006) (addressing limitations) and Magouirk v. Phillips, 144 F.3d 348, 358 (5th Cir. 1998) (addressing exhaustion)).

I find that Workman did not raise his claims of ineffective assistance of trial counsel concerning failure to present the testimony of his siblings at trial, file pretrial motions, request Brady evidence, object to illegally obtained inadmissible evidence and challenge the "fake" file sent by Agent Hall to Workman in any state court, and therefore these claims were not exhausted in a procedurally proper manner.  When ineffective assistance of counsel is asserted, the claim is not exhausted if the petitioner did not raise or mention the same basis or legal theory in the state court proceedings that is asserted in a federal petition.  See Ogan v. Cockrell, 297 F.3d 349, 358 (5th Cir. 2002) ("Because Ogan is now proceeding on a different theory than that advanced in the state habeas court, we find this ineffectiveness of habeas counsel claim to be unexhausted."); Burns

v. Estelle, 695 F.2d 847, 849–50 (5th Cir. 1983) (factual bases for ineffective assistance claim were not exhausted as "significantly different" from those raised in state court). Thus, Workman failed to exhaust state court review of these portions of his ineffective assistance of counsel claim.

B.    NO REMAINING OPPORTUNITY TO EXHAUST

For the foregoing reasons, Workman has not allowed the state courts one full opportunity to review these claims through the Louisiana Supreme Court in a procedurally proper manner. The burden is on petitioner to assert his federal claim in the state courts at a time when state procedural law permits its consideration on the merits. Bell v. Cone, 543 U.S. 447, 451 n.3 (2005) (citing Baldwin, 541 U.S. at 30–32). When a petitioner has failed to exhaust state court remedies and the state court to which the petitioner would be required to present his claims would now find the claims procedurally barred, the claims are procedurally defaulted for purposes of federal habeas review and must be dismissed. Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991).

The record in this case reflects that Workman is now unable to litigate his unexhausted claims in the Louisiana courts. The Louisiana Supreme Court has already advised Workman that he no longer has available post-conviction remedies:

> Relator has now been fully litigated his application for post-conviction relief in state court. Similar to federal habeas relief, see 28 U.S.C. § 2244, Louisiana post-conviction procedure envisions the filing of a second or successive application only under the narrow circumstances provided in La.C.Cr.P. art. 930.4 and within the limitations period as set out in La.C.Cr.P. art 930.8. Notably, the legislature in 2013

> La. Acts 251 amended that article to make the procedural bars against successive filings mandatory. Relator's claims have now been fully litigated in accord with La.C.Cr.P. art. 930.6, and this denial is final. Hereafter, unless he can show that one of the narrow exceptions authorizing the filing of a successive application applies, relator has exhausted his right to state collateral review. The district court is ordered to record a minute entry consistent with this per curiam.

State v. Workman, 255 So.3d 579 (La. 2018) (per curiam) (La. 2018); State Record Volume 10 of 12, Louisiana Supreme Court Order, 17-KP-0716, October 29, 2018.

Workman therefore no longer has the opportunity to present his unexhausted claims in the state courts. A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion, because there are no longer any state remedies "available" to him. Gray v. Netherland, 518 U.S. 152, 161–162 (1996); see 28 U.S.C. § 2254(b); Coleman, 501 U.S. at 732 (citing Engle v. Isaac, 456 U.S. 107, 125–26, n.28 (1982)). The United States Supreme Court has determined that the exhaustion requirement "'refers only to remedies still available at the time of the federal petition,' [and] it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law.'" Gray, 518 U.S. at 161–62(quoting Engle, 456 U.S. at 125 n.28, and Castille v. Peoples, 489 U.S. 346, 351 (1989))(emphasis added, citations omitted).

I therefore find that state court review of Workman's unexhausted claims is technically exhausted, and the claims must be evaluated for procedural default. See Gray, 518 U.S. at 162 ("... the procedural bar that gives rise to exhaustion provides an

23

independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim ..."); <u>Coleman</u>, 501 U.S. at 735 n.1 ("[I]f the petitioner failed to exhaust state remedies and the court to which petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, ... [then] there is a procedural default for purposes of federal habeas... .").

The procedural bar created by a petitioner's technical exhaustion stands as an adequate and independent state procedural ground and prevents federal habeas corpus review of a defaulted claim. <u>Gray</u>, 518 U.S. at 162; <u>see also</u>, <u>Coleman</u>, 501 U.S. at 735 n.1; <u>Beazley v. Johnson</u>, 242 F.3d 248, 264 (5th Cir. 2001). In the interest of judicial economy, I will address the procedural bar to these and Workman's other defaulted claim in the following section of this report. To the extent the State's exhaustion and procedural default defenses differ from the foregoing analysis, **petitioner is hereby specifically instructed that this report and recommendation is notice to him that this court is sua sponte raising the issue of procedural default and that petitioner must submit any evidence or argument concerning the default as part of any objections he may file to this report**. <u>Magouirk</u>, 144 F.3d at 348.

V.    <u>PROCEDURAL DEFAULT</u>

In addition to the unexhausted claims, the state courts imposed a procedural bar to one of Workman's other claims. Specifically, in his third federal habeas claim, Workman asserts that the state trial judge erred when he denied a motion for mistrial based on statements by the prosecutor that Workman had fabricated his defense, which Workman claims constituted prosecutorial misconduct.

On cross-examination, the prosecutor and Workman had the following exchange:[49]

A:    Anything. I'm just trying to get a rise out of this guy, See what he's doing. See what he's up to. I'm not – My intent, I know my intent.

Q.    You keep saying "intent." Why do you keep saying "intent"?

A.    Because I'm trying to find out if his intent is really to do what he's saying he's doing.

Q.    Because you've been sitting –Isn't it because you've been sitting in jail thinking about this charge, and you know intent is what this whole case is about?

Defense counsel objected and, at a bench conference, argued:[50]

We've gone to great lengths to show that this man is not in jail. I've walked to the staircase with him each time the Jury's taken a break. We purposely don't bring him in in orange, we don't bring him handcuffed.

For him to say he'd been sitting in jail is improper and it's to prejudice this Jury and I'm going to move for a mistrial.

---

[49]State Record Vol. 6 of 12, Trial Transcript, p. 80, 2/27/12.

[50]Id. at pp. 80–81.

The prosecutor responded that, on direct examination, defense counsel brought up the fact that law enforcement visited Workman while he was in jail.[51]  The trial court agreed that defense counsel asked Workman about Detective Rivard's interview of him while he was in jail.[52]  The trial court rejected defense counsel's argument that his question related to when Workman was first arrested while the prosecution's question related to two years later and explained, "There is no time frame.  But he's saying that he didn't give a time frame when he just asked that question.  Your motion is denied and your objection is overruled."[53]

In his motion for new trial, defense counsel argued that Workman was prejudiced by the prosecutor alluding to the fact that petitioner had been in jail for two years.[54]  The trial court found:[55]

> With regard to point two, the action of the District Attorney, the Court would note that the Defense did mention, in examination, that Mr. Workman was in jail.
>
> The Court would agree that the Court goes at great lengths to insure that Defendants are not prejudiced.  Mr. Workman was allowed to wear civilian clothes.  He was very well-dressed for the trial, and the Court believes that it's not necessary to do that, but the Court allows that to happen.

---

[51]Id. at p. 81.

[52]Id. at p. 82.

[53]Id.

[54]State Record Vol. 1 of 12, Motion for New Trial, 3/6/14.

[55]State Record Vol. 6 of 9, Sentencing Transcript at pp. 5–6, 3/10/14.

The Court, also would note that the Jury never saw Mr. Workman escorted by police officers, they never saw Mr. Workman in shackles or handcuffs. The Court, when it considers the entire circumstances, believes that that does not rise to a level that should require a new trial.

On direct appeal, Workman asserted that the trial court should have granted a mistrial based on the prosecutor's suggestion that Workman had concocted his defense while sitting in jail. The Louisiana Fifth Circuit found that Workman's claim that a mistrial should have been granted was based on a different basis than the one asserted at trial.[56] The appellate court explained that defense counsel did not make a contemporaneous objection based on prosecutorial misconduct concerning statements regarding Workman's alleged fabrication of his defense but rather objected to the comment regarding Workman sitting in jail. The appellate court found that the claim had been waived due to failure to lodge a contemporaneous objection, citing State v. Carter, 75 So.3d 1, 6 (La. App. 5th Cir. 2011).[57] Because the Louisiana Supreme Court rejected Workman's direct appeal without stated reasons, this court presumes that it relied upon the same grounds as the last reasoned state court opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) (when the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, the federal court will

---

[56]Workman, 170 So. 3d at 294; State Record Vol. 6 of 12, 5th Cir. Opinion, 14-KA-559 at p. 24, 4/15/15.

[57]Id.; State Record Vol. 6 of 12, 5th Cir. Opinion, 14-KA-559 at p. 24, 4/15/15.

presume that the state court has relied upon the same grounds as the last reasoned state court opinion).

Generally, a federal court will not review a question of federal law decided by a state court if the decision of that state court rests on a state ground that is both independent of the federal claim and adequate to support that judgment. Coleman, 501 U.S. at 731–32; Glover v. Cain, 128 F.3d 900, 902 (5th Cir. 1997); Amos v. Scott, 61 F.3d 333, 338 (5th Cir. 1995) (citing Harris v. Reed, 489 U.S. 255, 260, 262 (1989)). This "independent and adequate state law" doctrine applies to both substantive and procedural grounds and affects federal review of claims that are raised on either direct or habeas review.  Amos, 61 F.3d at 338.

Procedural default does not bar federal court review of a federal claim in a habeas petition unless the last state court to render a judgment in the case has clearly and expressly indicated that its judgment is independent of federal law and rests on a state procedural bar.  Harris, 489 U.S. at 263; Glover, 128 F.3d at 902.  The procedural bars also prevail over any alternative discussion of the merits of the claim by a state court. See Robinson v. Louisiana, 606 F. App'x 199, 204 (5th Cir. 2015) (citing Woodfox v. Cain, 609 F.3d 774, 796 (5th Cir. 2010)).  In this case, the procedural rule cited by the Louisiana Fifth Circuit on direct appeal bars review of Workman's federal habeas claim.

A.      INDEPENDENT AND ADEQUATE

For the state law procedural bar to prevent review by this federal habeas court, the bar must be independent and adequate.  A procedural restriction is "independent" if the state court's judgment "clearly and expressly" indicates that it is independent of federal law and rests solely on a state procedural bar.  Amos, 61 F.3d at 338.  The United States Fifth Circuit has held that "[a] state court expressly and unambiguously bases its denial of relief on a state procedural default even if it alternatively reaches the merits of a [petitioner's] claim."  Fisher v. Texas, 169 F.3d 295, 300 (5th Cir. 1999).

To be "adequate," the state procedural rule must be strictly or regularly followed and evenhandedly applied to the majority of similar cases.  Walker v. Martin, 562 U.S. 307, 316 (2011); Glover, 128 F.3d at 902.  A state procedural rule "can be 'firmly established' and 'regularly followed,'—even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others."  Beard v. Kindler, 558 U.S. 53, 60–61 (2009) (citation omitted).  The question of the adequacy of a state procedural bar is itself a federal question.  Beard, 558 U.S. at 60 (citing Lee v. Kemna, 534 U.S. 362, 375 (2002)).

The last reasoned decision on Workman's prosecutorial misconduct claim was the Louisiana Fifth Circuit decision relying on Louisiana procedural rules governing preservation of claims for direct appeal.  See Ylst, 501 U.S. at 802.  The court cited Louisiana law restricting appellate review to those objections and grounds presented to

29

the state trial court.[58]   The principal Louisiana statutory provision requiring a contemporaneous objection is La. Code Crim. P. art. 841(A), which provides that "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence."  It is well-settled that this type of "contemporaneous objection" rule is an "independent and adequate" state procedural ground which bars federal habeas corpus review.  Wainwright v. Sykes, 433 U.S. 72, 87–88 (1977).  The reasons for the state courts' dismissal of Workman's claim, therefore, were independent of federal law and relied strictly on state procedural requirements.  See Harris, 489 U.S. at 263.

It is well-settled and regularly enforced in Louisiana law that a criminal defendant is limited on appeal to those grounds on which an objection was articulated at trial.  See e.g., State v. Taylor, 887 So.2d 589 (La. App. 5th Cir. 2004); State v. Torregano, 875 So.2d 842 (La. App. 5th Cir. 2004); State v. West, 419 So.2d 868 (La. 1982); State v. Provo, 396 So.2d 1298 (La. 1981); State v. Johnson, 389 So.2d 372 (La. 1980). Therefore, the failure to preserve a claim contrary to Louisiana law, including La. Code Crim. P. art. 841, provides adequate state grounds to bar review by the federal courts in a habeas corpus proceeding.  See Proctor v. Butler, 831 F.2d 1251, 1253 (5th Cir. 1987). The same is true in this case.

---

[58]Workman, 170 So.3d at 294 (citing State v. Carter, 75 So.3d 1, 6 (La. App. 5th Cir. 2011)); State Record Vol. 6 of 12, 5th Cir. Opinion, 14-KA-559 at p. 24, 4/15/15.

The state courts' ruling was based on Louisiana law setting forth the procedural requirements for the preservation and presentation of claims on direct appeal.  See Fisher, 169 F.3d at 300 (state courts' clear reliance on state procedural rule is determinative of the issue).  The state courts' reasons for denial of relief on Workman's claim were therefore independent of federal law and adequate to bar review of his claims in this federal habeas court.

B.    CAUSE AND PREJUDICE

A federal habeas petitioner may be excepted from the procedural default rule only if he can show "cause" for his default and "prejudice" attributed to it, or demonstrate that the federal court's failure to review the defaulted claim will result in a "fundamental miscarriage of justice."  Fisher, 169 F.3d at 301 (citing Magouirk v. Phillips, 144 F.3d 348, 359 (5th Cir. 1998); Coleman, 501 U.S. at 748–50); Amos, 61 F.3d at 338–39 (citing Harris, 489 U.S. at 262; Engle v. Isaac, 456 U.S. 107, 129 (1982)).

To establish cause for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded his efforts to comply with the state's procedural rule.  Murray v. Carrier, 477 U.S. 478, 488 (1986).  The mere fact that petitioner or his counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.  Id. at 486.

31

Workman has not offered any cause for his failure to exhaust or present his claims in a timely and proper manner to the state courts. The record does not support a finding that any factor external to the defense prevented petitioner from asserting these claims in a procedurally proper manner. The record reflects no action or inaction by the State which prevented him from properly asserting these claims in the state courts.

"The failure to show 'cause' is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown." Hogue v. Johnson, 131 F.3d 466, 497 (5th Cir. 1997) (citing Engle, 456 U.S. at 134 n.43). Having failed to show an objective cause for his default, the court need not determine whether prejudice existed, and petitioner has not alleged any actual prejudice. Ratcliff v. Estelle, 597 F.2d 474, 477 (5th Cir. 1979) (citing Lumpkin v. Ricketts, 551 F.2d 680, 681–82 (5th Cir. 1977)).

C.    FUNDAMENTAL MISCARRIAGE OF JUSTICE

A petitioner may avoid procedural bar only if a fundamental miscarriage of justice will occur if the merits of his claim are not reviewed. Hogue, 131 F.3d at 497 (citing Sawyer v. Whitley, 505 U.S. 333, 339 (1992)). To establish a fundamental miscarriage of justice, petitioner must provide this court with evidence that would support a "colorable showing of factual innocence." Kuhlmann v. Wilson, 477 U.S. 436, 454 (1986); accord Murray, 477 U.S. at 496; Glover, 128 F.3d at 902. To satisfy the factual innocence standard, petitioner must establish a fair probability that, considering all of the evidence now available, the trier of fact would have entertained a reasonable doubt as to

the defendant's guilt. Campos v. Johnson, 958 F.Supp. 1180, 1195 (W.D. Tex. 1997) (footnote omitted); see Nobles, 127 F.3d at 423 n.33 (actual innocence factor requires a showing by clear and convincing evidence that, "but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."). When the petitioner has not adequately asserted his actual innocence, his procedural default cannot be excused under the "fundamental miscarriage of justice" exception. Glover, 128 F.3d at 903.

The actual innocence standard encompasses three principles. First, a "credible [actual innocence] claim requires new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." House v. Bell, 547 U.S. 518, 537 (2006) (quoting Schlup v. Delo, 513 U.S. 298, 324 (1995)). The United States Fifth Circuit Court of Appeals has held that evidence is "not 'new' [when] it was always within the reach of [petitioner's] personal knowledge or reasonable investigation." Moore v. Quarterman, 534 F.3d 454, 465 (5th Cir. 2008). Second, the court's analysis is not limited to the new evidence presented by a petitioner in support of his actual innocence claim. Id. "The habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that govern at trial." Bell, 547 U.S. at 538 (quoting Schlup, 513 U.S. at 327). In doing so, the court "must assess the probative force of the newly presented evidence in connection

with the evidence of guilt adduced at trial." <u>Schlup</u>, 513 U.S. at 331–32. Third, the "demanding" actual innocence standard "permits review only in the extraordinary case." <u>Bell</u>, 547 U.S. at 538 (citation omitted); <u>see also</u> <u>Fairman v. Anderson</u>, 188 F.3d 635, 644 (5th Cir. 1999) ("[O]ur precedent confirms that the mountain ... a petitioner must scale in order to prove a fundamental miscarriage claim is daunting indeed.").

In this case and under these standards, Workman has not referenced or presented any new evidence of his factual innocence or any evidence that might persuade a court that no juror would have found him guilty.  <u>Accord</u>, <u>Golmon v. Director, TDJC-CID</u>, WL 3724838, at *1 (E.D. Tex. Jul. 15, 2013).  His contentions in support of his actual innocence claim and entrapment are part of the same defense evidence available at trial and already considered by the jury.

For these reasons, Workman has failed to overcome the procedural bar to his claims, and the foregoing claims, both actually and technically exhausted, must be dismissed with prejudice as procedurally defaulted.

VI.    <u>STANDARDS OF MERITS REVIEW</u>

28 U.S.C. §§ 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law in federal habeas corpus proceedings.  <u>Nobles</u>, 127 F.3d at 419–20 (citing 28 U.S.C. § 2254(b) and (c)).

Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2)), cert. denied, 532 U.S. 1039 (2001). The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption. 28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent.]'" Penry v. Johnson, 215 F.3d 504, 507 (5th Cir. 2000) (quoting Miller v. Johnson, 200 F.3d 274, 280–81 (5th Cir.), cert. denied, 531 U.S. 849 (2000)), aff'd in part, rev'd in part on other grounds, 532 U.S. 782 (2001); Hill, 210 F.3d at 485. The United States Supreme Court has clarified the Section 2254(d)(1) standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from

> this Court's decisions but unreasonably applies that principle to the facts
> of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 405–06, 412–13 (2000); Penry v. Johnson, 532 U.S. 782, 792–93 (2001); Hill, 210 F.3d at 485. The "critical point" in determining the Supreme Court rule to be applied "is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." (citation omitted) White v. Woodall, 572 U.S. 415, 427 (2014) (citing Harrington v. Richter, 562 U.S. 86, 103 (2011)), and Knowles v. Mirzayance, 556 U.S. 111, 122 (2009). "Thus, 'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'" White, 134 S.Ct. at 1706 (quoting Yarborough v. Alvarado, 541 U.S. 652, 666 (2004)).

"'A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state court decision applied [a Supreme Court case] incorrectly.'" Price v. Vincent, 538 U.S. 634, 641 (2003) (quoting Woodford v. Visciotti, 537 U.S. 19, 24–25 (2002)) (brackets in original); Bell v. Cone, 535 U.S. 685, 699 (2002). Rather, under the "unreasonable application" standard, "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable." Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002), cert.

denied, sub nom, Neal v. Epps, 537 U.S. 1104 (2003). The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner. Price, 538 U.S. at 641 (quoting Woodford, 537 U.S. at 24–25); Wright v. Quarterman, 470 F.3d 581, 585 (5th Cir. 2006).

A.    DENIAL OF MOTIONS TO SUPPRESS (CLAIM NO. 1)

Workman argues that the state trial court erred in denying the motions to suppress his statement to police. He alleges that his statement was the product of fear, duress, intimidation, menaces, threats, inducements and/or promises.

Defense counsel filed a motion to suppress petitioner's statement on June 12, 2012.[59] Petitioner filed a similar pro se motion to suppress his statement on March 26, 2013.[60] A hearing was held on February 25, 2014, after which the state trial court denied both motions to suppress.[61]

Both Workman and his counsel asserted this claim on direct appeal. The state appellate court found that Workman was twice advised of his Miranda rights and there was no indication from the record that Workman was coerced into making his statement under the influence of "threats" made by Agent Hall. The court noted that Agent Hall's

---

[59]State Record Vol. 1 of 12, Omnibus Motions and Order for Pre-Trial Motions, 6/12/12.

[60]State Record Vol. 1 of 12, Pro Se Omnibus Motions and Order for Pre-trial Motions, 3/26/13.

[61]State Record Vol. 1 of 12, Trial Minutes, 2/25/14; State Rec Vol. 5 of 12, Hearing Transcript, 2/25/14.

advice to Workman of the criminal consequences of lying was not perceived as a threat, since Workman continued to be untruthful until he was presented with the e-mails regarding his wrongdoing. The court found that the trial court did not err in denying petitioner's motion to suppress the statement, concluding that it was freely and voluntarily made and <u>not</u> influenced by fear, intimidation, menaces, threats, inducement or promises.[62] This was the last reasoned state court opinion on the issue. <u>See</u> <u>Ylst</u>, 501 U.S. at 802.

The admissibility of a confession is a mixed question of law and fact. <u>Miller v. Fenton</u>, 474 U.S. 104, 112 (1985); <u>ShisInday v. Quarterman</u>, 511 F.3d 514, 522 (5th Cir.2007) (citing <u>Miller</u>, 474 U.S. at 112). A federal court on habeas review must respect the state court's determination of voluntariness as long as it was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U .S.C. § 2254(d)(1); <u>Barnes v. Johnson</u>, 160 F.3d 218, 222 (5th Cir. 1998). In doing so, a federal habeas court must afford a presumption of correctness to state courts' findings of fact if they are fairly supported by the record. <u>Miller</u>, 474 U.S. at 117.

Two inquiries determine whether an accused has voluntarily and knowingly waived his Fifth Amendment privilege against self-incrimination. <u>Moran v. Burbine</u>, 475

---

[62]<u>Workman</u>, 170 So.3d at 291–94; State Record Vol. 6 of 12, 5th Cir. Opinion, 14-KA-559 at pp. 19-23, 4/15/15.

U.S. 412, 421 (1986); <u>Soffar v. Cockrell</u>, 300 F.3d 588, 592 (5th Cir.2002). First, waiver of the right must be voluntary and not the product of intimidation, coercion or deception. <u>Moran</u>, 475 U.S. at 421. Second, the waiver must be made with full awareness of the nature of the right being waived. <u>Id.</u> In making these inquiries, the court must consider the "totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 224 (1973). Although mental state or condition may be a significant factor in the voluntariness determination, "this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" <u>Carter v. Johnson</u>, 131 F.3d 452, 462 (5th Cir.1997) (citing <u>Colorado v. Connelly</u>, 479 U.S. 157, 164 (1986)). Thus, coercive police conduct is a necessary prerequisite to a conclusion that a confession was involuntary, and the defendant must establish a causal link between the coercive conduct and the confession. <u>Carter</u>, 131 F.3d at 462 (citing <u>Connelly</u>, 479 U.S. at 163–67).

In assessing voluntariness, "trickery or deceit is only prohibited to the extent it deprives the suspect 'of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" <u>Soffar</u>, 300 F.3d at 596 (quoting <u>Moran</u>, 475 U.S. at 424). Determining whether officers engaged in coercive tactics to elicit a confession is a question of fact, and the state court's factual findings are entitled to deference when supported by the record. <u>Pemberton v. Collins</u>, 991 F.2d 1218, 1225

(5th Cir.1993); <u>Self v. Collins</u>, 973 F.2d 1198, 1204 (5th Cir.1992); <u>see also</u> <u>Miller</u>, 474 U.S. at 112 (noting that subsidiary questions such as whether the police engaged in coercive tactics are afforded the presumption of correctness).

The habeas corpus statute obliges federal judges to respect credibility determinations made by the state court trier of fact.  <u>Pemberton</u>, 991 F.2d at 1225 (citing <u>Sumner v. Mata</u>, 455 U.S. 591, 597 (1982)).  However, if the underlying facts as determined by the state court indicate the presence of some coercive tactic, the impact that factor had on the voluntariness of the confession is a matter for independent federal determination and is ultimately a legal determination.  <u>Miller</u>, 474 U.S. at 117; <u>ShisInday</u>, 511 F.3d at 522.

Even if the confession is deemed involuntary under these standards, the Supreme Court has held that admission of an involuntary confession into evidence is a trial error subject to harmless error analysis.  <u>Arizona v. Fulminante</u>, 499 U.S. 279, 310 (1991).  Under these standards, to grant federal habeas relief, the trial error must have a substantial and injurious effect or influence in determining the verdict.  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).  Therefore, even if this court were to find that petitioner's Fifth Amendment rights were violated, the court must also consider whether use of the confession at trial was harmless in determining the verdict.  <u>Hopkins v. Cockrell</u>, 325 F.3d 579, 583 (5th Cir.2003).

In Workman's case, as required by <u>Jackson v. Denno</u>, 378 U.S. 368 (1964), the state trial court conducted an evidentiary hearing on the admissibility of Workman's inculpatory statements, taking testimony from Special Agent Jamie Hall.[63] Hall testified that both he and Detective Zuppardo advised Workman of his <u>Miranda</u> rights before interviewing him and that Workman verbally acknowledged his rights and executed both the FBI and Kenner Police Department Advice of Rights forms.[64]  Hall identified the forms Workman signed indicating that he understood his rights, waived them and consented to questioning.[65]  Hall testified that he did not make any promises to Workman or threaten or coerce him to make a statement.[66]  Hall explained that Workman told him that he posted a Craig's List advertisement because he wanted "someone's daughter to do" and that he began corresponding with a person using the moniker "Savage."[67] Workman admitted that he and "Savage" traded pornography via e-mail and although he did not recall how many times they exchanged pornography, he further admitted to sending images of his minor niece stepping out of the shower and a minor under five

---

[63]State Record Vol. 1 of 12, Trial Minutes, 2/25/14; State Record Vol. 5 of 12, Trial Transcript, 2/25/14.

[64]State Record Vol. 5 of 12, Trial Transcript at pp. 7-9, 15, 2/25/14.

[65]<u>Id.</u> at pp. 8-9.

[66]<u>Id.</u> at p. 10.

[67]<u>Id.</u>

years old with an adult male ejaculating onto her body.[68]  They ultimately scheduled a meeting for Workman to have sex with whom he thought was a twelve-year-old girl.[69] Workman admitted that when he was stopped, he was traveling to the residence to have sex with the minor.[70]  He also informed police that he had e-mail correspondence with "Ron Anderson" and attempted to meet with him to have sex with his eleven-year-old daughter.[71]

On cross-examination, Hall testified that he always begins his interviews by informing the interviewee of the consequences of lying during a federal investigation, including up to a year in prison and a $250,000 fine.[72]  According to Hall, Workman was initially untruthful and said he was going to the residence to see if there was actually a twelve-year-old girl at the residence and, if so, he planned to call the police.[73]  Hall told Workman he believed that Workman was lying to him and reiterated that Workman could be penalized for being untruthful.[74]  Thereafter, Workman admitted he was

---

[68]Id. at pp. 10-12, 20.

[69]Id. at p. 10.

[70]State Record Vol. 5 of 12, Trial Transcript at pp. 11, 21, 2/25/14.

[71]Id. at p. 11.

[72]Id. at pp. 18, 24.

[73]Id. at p. 17.

[74]Id. at pp. 18-19.

traveling to the residence to have sex with a twelve-year-old girl.[75]  After hearing the testimony, the state trial court permitted use of the confession, explaining that Workman was advised of his rights, acknowledged that he understood them both verbally and in writing, and thereafter made incriminating statements.[76]  The trial court found that while Hall advised Workman of the criminal consequences of lying, those statements did not constitute duress.[77]

While Workman's counsel did not file a writ application in connection with the trial court's adverse decision, he did raise the issue on direct appeal.  The Louisiana Fifth Circuit entered its own findings, which constitute the last reasoned decision on this issue.  The appellate court considered and reviewed the evidence and testimony that was received at the suppression hearing.  After considering the evidence, the court held:[78]

> Although defendant in the instant matter does not contest that he was properly Mirandized, it is noted that prior to interviewing defendant about the crimes for which he was arrested, defendant was twice advised of his Miranda rights both orally and in writing by Detective Zuppardo and Agent Hall.  Defendant indicated that he understood his rights and signed both the FBI's and the Kenner Police Department's advice of rights form, waiving his rights.
>
> Further, based on the evidence and testimony from the suppression hearing and the trial, the record is devoid of any indication that defendant

---

[75]Id. at p. 19.

[76]State Record Vol. 5 of 12, Trial Transcript at p. 28, 2/25/14.

[77]Id.

[78]Workman, 170 So. 3d at 293–94; State Record Vol. 6 of 12, 5th Cir. Opinion, 14-KA-559 at pp. 22–23, 4/15/15.

was coerced into making his statement under the influence of "threats" made by Agent Hall. As stated by the trial court, "[a]lthough the agent advised him of the criminal consequences of lying, the Court believes that that does not rise to the level of duress to force Mr. Workman to tell something that is untrue." Additionally, the record further establishes that such an advisal was not perceived as a threat to defendant who continued to be untruthful with Agent Hall until he was presented with concrete evidence in the form of the email correspondences regarding his wrongdoing. Accordingly, we find the trial court did not err in denying defendant's motion to suppress statement, upon concluding that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducement, or promises.

On federal habeas review, this court must presume that the factual determinations of the state courts supporting its legal conclusion were correct, including that Workman failed to demonstrate that anything Agent Hall told him amounted to unlawful inducement or threat that compelled him to make the otherwise voluntary statement. The same presumption applies to the court's factual findings concerning the voluntariness of the confession, including that Workman was advised of his <u>Miranda</u> rights, that he indicated that he understood his rights and that he voluntarily waived those rights. <u>Pemberton</u>, 991 F.2d at 1225.

To overcome the presumption of correctness as to the state court's factual findings, Workman must rebut them by clear and convincing evidence. He has not done so. For the most part, Workman merely repeats his allegations of threats and coercion already addressed by the state courts. Workman asserts that the he was not informed of his rights until he was "restrained in an interrogation room and threatened with arrest if

he did not answer questions" and that the interrogation "took a mental and physical toll on him due to these officers' threats."[79]  He further contends, for the first time, that the interrogation continued after he requested that the questioning stop so he could retain an attorney.[80] These allegations are unsupported by any evidence adduced at the motion hearing, the trial, on appeal or otherwise.

The sole allegation by Workman supported by the record is that he was informed of the penalties of lying to a federal agent.  Allegations that law enforcement personnel informed the defendant of the penalties of lying, in and of themselves, do not render Workman's statements involuntary.  See, e.g., Rivers v. United States, 400 F.2d 935, 943 (5th Cir. 1968) ("With Miranda awareness of his rights to remain silent, to have counsel, and his willingness to talk, he had no constitutional right to lie and on officer's admonition to tell the truth, whether based on morals or even misguided notions of statutory prohibitions, does not of itself measure up to a paradoxical breach of the Constitution or coercive pressure rendering the statement involuntary."); United States v. Larson, 2019 WL 2587915, at *9 (D. Minn. Jun 6, 2019) (advising defendant that he thought he was lying and informing him of the penalties associated with lying to a federal agent does not amount to a strong-arm tactic), report and recommendation adopted, 2019 WL 2578151 (D. Minn. Jun. 24, 2019); United States v. Roberts, 2010 WL 234719, at

---

[79]Record Doc. No. 3-1 at pp. 2-3.

[80]Id. at p. 3.

45

*20 (E.D. Tenn. Jan. 14, 2010) (defendant's statement deemed to be voluntary when agents told defendant they believed he was lying and informed him that lying to a federal investigator was a felony with a penalty of imprisonment); United States v. Sabinkse, 2008 WL 11441848, at *9 (N.D. Ga. Jul. 25, 2008) (agent's honest statement to defendant that lying to federal agents was a crime that could expose him to additional charges was not improper or coercive), report and recommendation adopted, 2008 WL 11441903 (N.D. Ga. Aug. 14, 2008).

The state court's factual determinations regarding voluntariness are supported by the record. Therefore, this court on habeas corpus review must accept as conclusive the state court's factual determination that Workman's statements were voluntary. The state court's legal conclusion that Workman's statements were voluntary reasonably follows from these facts. Since the statements were voluntary as a matter of fact and law, harmless error analysis is unnecessary. The denial of relief on this issue is not contrary to or an unreasonable application of Supreme Court precedent. Workman is not entitled to relief on this claim.

B.    INSUFFICIENCY OF EVIDENCE & ENTRAPMENT (CLAIM NOS. 2 & 6)

Workman claims that the evidence was insufficient to prove that he was guilty of the crimes of which he was convicted and that the trial court erred in holding that there was no entrapment as a matter of law. He contends that the State failed to show he had

specific intent or that he was predisposed to commit the crimes before government involvement.

Workman presented these claims to the Louisiana Fifth Circuit on direct appeal. The court considered the claims under the standards set forth in Jackson v. Virginia, 443 U.S. 307 (1979), and related state case law, and found that intent was a credibility issue and that there was sufficient evidence from which the jury could have reasonably concluded that Workman was guilty of attempted aggravated rape upon a victim under the age of thirteen and possession and distribution of child pornography.[81] The Louisiana Fifth Circuit explained that entrapment was an issue for the jury and that, considering the officers' testimony and Workman's e-mails requesting a meeting to have sex with a twelve-year-old girl, a rational trier of fact could have found that Workman failed to establish by a preponderance of the evidence that he was induced by a government agent to commit the crimes for which he was convicted.[82]  This was the last reasoned opinion by a state court on this issue.  Ylst, 501 U.S. at 802.

Under Jackson, a federal habeas court addressing an insufficiency of the evidence claim must determine, after viewing the evidence in the light most favorable to the prosecution, whether a rational trier of fact could have found that the essential elements

---

[81]Workman, 170 So.3d at 288–91; State Record Vol. 6 of 12, 5th Cir. Opinion, No. 14-KA-559 at pp. 12-19, 4/15/15.

[82]Id. at 291; State Record Vol. 6 of 12, 5th Cir. Opinion, No. 14-KA-559 at pp. 18-19, 4/15/15.

of the crime were proven beyond a reasonable doubt.  <u>Jackson</u>, 443 U.S. at 319; <u>Williams</u> <u>v. Cain</u>, 408 F. App'x 817, 821 (5th Cir. 2011); <u>Perez v. Cain</u>, 529 F.3d 588, 594 (5th Cir. 2008).  Thus, to determine whether the commission of a crime is adequately supported by the record, the court must review the substantive elements of the crime as defined by state law.  <u>Perez</u>, 529 F.3d at 594 (citing <u>Jackson</u>, 443 U. S. at 324 n. 16).

The court's consideration of the sufficiency of the evidence extends only to what was presented at trial.  <u>See</u> <u>McDaniel v. Brown</u>, 558 U.S. 120, 131, 134 (2010) (recognizing that a reviewing court must consider the trial evidence as a whole under <u>Jackson</u>); <u>Johnson v. Cain</u>, 347 F. App'x 89, 91 (5th Cir. 2009) (<u>Jackson</u> standard relies "upon the record evidence adduced at the trial") (quoting <u>Jackson</u>, 443 U.S. at 324). Review of the sufficiency of the evidence, however, does <u>not</u> include review of the <u>weight</u> of the evidence or the <u>credibility</u> of the witnesses, because those determinations are the exclusive province of the jury.  <u>United States v. Young</u>, 107 F. App'x 442, 443 (5th Cir. 2004) (citing <u>United States v. Garcia</u>, 995 F.2d 556, 561 (5th Cir. 1993)); <u>see</u> <u>Jackson</u>, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").  All credibility choices and conflicting inferences must be resolved in favor of the verdict.  <u>Ramirez v. Dretke</u>, 398 F.3d 691, 695 (5th Cir. 2005).

A federal habeas court is <u>not</u> authorized to substitute its interpretation of the evidence or its view of the credibility of witnesses in place of the fact-finder.  <u>Weeks v.</u>

<u>Scott</u>, 55 F.3d 1059, 1062 (5th Cir. 1995); <u>Alexander v. McCotter</u>, 775 F.2d 595, 598 (5th Cir. 1985).  In addition, "[t]he <u>Jackson</u> inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit.'"  <u>Santellan v. Cockrell</u>, 271 F.3d 190, 193 (5th Cir. 2001) (quoting <u>Herrera v. Collins</u>, 506 U.S. 390, 402 (1993)).

A claim of insufficient evidence presents a mixed question of law and fact.  <u>Perez</u>, 529 F.3d at 594; <u>Maes v. Thomas</u>, 46 F.3d 979, 988 (10th Cir. 1995).  Therefore, this court must examine whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.[83]

Workman was charged with and convicted of attempted aggravated rape of a child under the age of thirteen and four counts of possessing or distributing child pornography.  At the relevant time, aggravated rape (now designated as first degree rape), was defined in relevant part as anal, oral or vaginal sexual intercourse with a victim under the age of

---

[83]"The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. Rev. Stat. § 15:438.  However, on federal habeas corpus review, the court does not apply this state law "reasonable hypothesis" standard, but instead must apply <u>Jackson</u>. <u>See</u> <u>Gilley v. Collins</u>, 968 F.2d 465, 467 (5th Cir. 1992) (citing <u>Schrader v. Whitley</u>, 904 F.2d 282, 284 (5th Cir. 1990)).  To the extent petitioner relies on Louisiana's circumstantial evidence rule itself, "[t]his is not a purely separate test from the <u>Jackson</u> standard to be applied instead of a sufficiency of the evidence test. . . . Ultimately, all evidence, both direct and circumstantial, must be sufficient under <u>Jackson</u> to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt." <u>State v. Porretto</u>, 468 So. 2d 1142, 1146 (La. 1985); <u>accord</u> <u>State v. Williams</u>, 693 So. 2d 204, 208 (La. App. 4th Cir. 1997).  The reasonable hypothesis standard under state law is "just an evidentiary guide for the jury.  If a rational trier of fact reasonably rejects the defendant's hypothesis of innocence, that hypothesis fails." <u>State v. Maxie</u>, 614 So. 2d 1318, 1321 (La. App. 3d Cir. 1993); <u>accord</u> <u>State v. Williams</u>, 693 So. 2d at 208.  The appropriate standard for this court remains <u>Jackson</u> as applied under the parameters of the AEDPA.

thirteen.  La. Rev. Stat. § 14:42(A)(4).  A perpetrator has attempted aggravated rape when, with specific intent to do so, he commits an act for the purposes of and tending directly to accomplish one or more of the prohibited acts of intercourse.  State v. German, 133 So. 3d 179, 191 (La. App. 4th Cir. 2014) (citing La. Rev. Stat. § 14:27).  Sufficient evidence to convict a defendant of attempted aggravated rape under Louisiana law has been found to exist where a defendant travels to meet a fictitious victim.  Prine v. Winn Correctional Center, 2013 WL 4096961, at *3–*5 (W.D. La. Aug. 13, 2013); State v. Thurston, 900 So. 2d 846, 849–53 (La. App. 5th Cir. 2005) (defendant's conversations with an undercover police officer posing as the mother of a nine-year old girl, which included statements of his intent to perform sex acts on the child, along with his travel to meet the fictitious victim, were sufficient to constitute an overt act tending towards accomplishing aggravated rape).

Louisiana law defines specific intent as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."  La. Rev. Stat. § 14:10(1).  Under Louisiana law, specific intent need not be proven directly but may be inferred from the actions of the defendant and the circumstances surrounding those actions.  State v. Sharlhorne, 554 So.2d 1317, 1321 (La. App. 1st Cir. 1989); State v. Tate, 851 So.2d 921, 930 (La. 2003) (citing State v. Brooks, 505 So.2d 714, 717 (La.1987).  The existence of

specific intent is a conclusion to be resolved by the trier of fact.  State v. Alexander, 182 So.3d 126, 130 (La. App. 1st Cir. 2015).

La. Rev. Stat. § 14:81.1(A)(1) provides that "[i]t shall be unlawful for a person to produce, promote, advertise, distribute, possess, or possess with the intent to distribute pornography involving juveniles."  Pornography involving juveniles is a general intent crime.  State v. Cinel, 646 So. 2d 309 (La. 1994), cert denied, 516 U.S. 881, 116 S. Ct. 215, 133 L.Ed.2d 146 (1995).  Under Louisiana law, general criminal intent is present "when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act."  La. Rev. Stat. § 14:10(2).  General intent may be inferred from the circumstance of the event and proved by direct or circumstantial evidence.  State v. Brokenberry, 942 So.2d 1209 (La. App. 2d Cir. 2006); State v. Culp, 17 So.3d 429 (La. App. 2d Cir. 2009).  Determination of whether the requisite intent is present in a criminal case is exclusively for the trier of fact.  State v. Huizar, 414 So.2d 741 (La. 1982).

The United States Fifth Circuit Court of Appeals has outlined the substance of Louisiana law on the defense of entrapment as follows:

> Under Louisiana law, "an entrapment is perpetrated when a law enforcement official or a person acting in cooperation with such an official, for the purpose of obtaining evidence of the commission of an offense, solicits, encourages, or otherwise induces another person to engage in conduct constituting such offense when he is not then otherwise disposed

to do so."  State v. Batiste, 363 So.2d 639, 641 (La. 1978) (emphasis added).  The Louisiana Supreme Court noted that its law is consistent with federal law.  Id.  "In entrapment cases, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal."  State v. Brand, 520 So.2d 114, 117 (La.1988) (citing Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958)).  "For entrapment to exist, a defendant must be induced in some way to engage in criminal conduct which he is not otherwise disposed to engage in; an entrapment defense will not lie if the officers or agents have merely furnished a defendant, who is predisposed to commit the crime, the opportunities to do so."  State v. Bernard, 441 So.2d 817, 820 (La. Ct. App.3d Cir.1983), writ denied, 445 So.2d 439 (La. 1984).  See also State v. Wysinger, 479 So.2d 673, 675 (La. Ct. App. 3d Cir.1985) ("Entrapment exists when the officer instigates the crime: that is, the officer must plan and conceive the crime and the defendant must have perpetrated it only because of the trickery, persuasion, or fraud of the officer .").

Jones v. Jones, 163 F.3d 285, 304 (5th Cir.1998); see also State v. Henderson, 58 So.3d 552, 558–59 (La. App. 2d Cir. 2011) (citing Brand, 520 So.2d at 114).

In this case, the jury heard testimony from Detective Zuppardo that the Kenner Police Department received an anonymous tip through its headquarters on March 8, 2012, advising that the police might want to investigate a certain advertisement on Craig's List.[84]  The tipster did not want to leave a name or make a report.[85]  Zuppardo located an advertisement titled "Somebody's Daughter" dated March 6, 2012, which stated, "Every woman is somebody's daughter.  Do you have a daughter you could bring

---

[84]State Record Vol. 5 of 12, Trial Transcript at pp. 12–14, 2/26/14.

[85]Id. at p. 14.

to me?  I'd love to do somebody's daughter."[86]  Zuppardo testified that, because the advertisement asked for the daughter to be brought to the writer, it implied the daughter would not be old enough to drive.[87]  Zuppardo, who was at the end of her shift, passed the information on to FBI Special Agent Jamie Hall.[88]  Hall, who was working in an undercover capacity, and Workman exchanged e-mails and agreed to meet at a location in Kenner.[89]  Zuppardo and Hall set up surveillance, and when they saw Workman's car turn down Idaho Street, Agent Zuppardo radioed a police unit to conduct a traffic stop.[90]  When petitioner was arrested, a blue post-it note was found torn in half on the passenger floorboard of his car with the address provided by Hall.[91]  Zuppardo and Hall met with Workman at the Kenner Police Department to conduct an interview.[92]  Before interviewing Workman, both Zuppardo and Hall advised Workman of his rights and he

---

[86]Id. at pp. 14–16.

[87]Id. at p. 16.

[88]Id. at p. 18.

[89]Id. at p. 19.

[90]State Record Vol. 5 of 12, Trial Transcript at pp. 20–24, 2/26/14.

[91]Id. at pp. 28–30.

[92]Id. at p. 31.

signed a form waiving them.[93]  Zuppardo testified that no force or coercion was used, no promises were made and Workman never asked for an attorney.[94]

Zuppardo took notes during the interview.[95]  According to Zuppardo, Workman admitted to posting the advertisement on Craig's List, communicating with "Savage" and sending a picture of his niece getting out of the shower.[96]  Workman told them that he intended to knock on the door at the Idaho residence and attempt to have sex with the twelve-year-old girl.[97]  Workman said, "If I couldn't have sexual intercourse, then I wouldn't want to do anything else with the girl."[98]  Workman admitted to sending child pornography to "Savage" and others.[99]  He mentioned a person named Ron Anderson, who Workman claimed had sent him child pornography and said he tried to make arrangements to have sex with Anderson's eleven-year-old daughter.[100]

---

[93]Id. at pp. 32-33.

[94]Id. at pp. 33-34.

[95]State Record Vol. 5 of 12, Trial Transcript at pp. 34–35, 2/26/14.

[96]Id. at pp. 35-36.

[97]Id. at p. 37.

[98]Id. at p. 37.

[99]Id. at pp. 37, 54.

[100]State Record Vol. 5 of 12, Trial Transcript at pp. 37, 49, 2/26/14.

FBI Special Agent Timothy Lucas conducted surveillance on Workman.[101]  Lucas watched Workman leave his apartment in his vehicle and, when he turned on a residential street, Lucas had Special Agent Harris take over so Workman would not realize he was being followed.[102]  Lucas testified that Workman's apartment was eventually searched pursuant to a warrant and a computer tower was seized.[103]

FBI Special Agent Lawrence Robinson, a computer forensic examiner, testified that Agent Hall asked him to image evidence on a USB thumb drive and a hard drive of a computer and create a disk of bookmarks Agent Hall found pertinent to the investigation.[104]  Robinson did not examine the hard drive.[105]  He categorized the files as "child erotica" and "child pornography."[106]  Robinson did not know if the images had been received by e-mail or had been downloaded from the internet directly.[107]  Robinson testified that one image was located in the recycle bin, which meant the image was deleted but the recycle bin was not emptied.[108]

---

[101]Id. at p. 57.

[102]Id. at. pp. 59–63.

[103]Id. at pp. 65–67.

[104]Id. at pp. 73, 79–84.

[105]Id. at p. 121.

[106]State Record Vol. 5 of 12, Trial Transcript at pp. 84, 101, 2/26/14.

[107]Id. at p. 122.

[108]Id. at p. 122.

FBI Agent Jamie Hall testified that on March 8, 2012, Zuppardo contacted him and asked him if he could find a Craig's List post that a concerned citizen had anonymously reported.[109]  Hall found a post titled "Somebody's Daughter."[110]  Because the person who posted the advertisement asked for a daughter to be brought to him, it indicated to Hall that the person was looking for someone under the age of sixteen.[111]  Hall replied using the moniker "Savage" and asked, "What are you looking for, in particular?  I may have something."[112]  Petitioner replied back, "Somebody's daughter, you have one?" and they communicated via e-mail, exchanging a total of 94 e-mails over a one-month period.[113]  Hall responded, "I may have a few options for you.  I have access to a lot of things.  Tell me what you want and I will see if I can help you out."[114]  Workman responded, "Like the title says, what have you got, and whose daughter?"[115]  Petitioner told Hall, "You may not be into what I'm interested in doing," and asked "Savage" if he had "some young pics."[116]  Hall asked petitioner "how young are you

---

[109]Id. at p. 134.

[110]Id. at pp. 135-136.

[111]Id. at p. 117.

[112]State Record Vol. 5 of 12, Trial Transcript at pp. 138, 142, 2/26/14.

[113]Id. at pp. 139–141, 143.

[114]Id. at p. 143.

[115]Id. at p. 144.

[116]Id., at p. 144.

looking for?" and expressed confusion as to whether petitioner wanted "someone's daughter" or photographs.[117]  Workman replied that he wanted "both" and asked, "You have somebody's daughter in mind?"[118]  Workman explained that he communicated with a man online who wanted Workman to "break in his eleven year old daughter. Something like that."[119]  At that point, Hall obtained a subpoena for the IP address.[120]

According to Workman's e-mail, Workman had intended to have sex with the man's daughter, but the man stopped writing him and, when Workman tried to e-mail him, he got a "delivery failure" message.[121]  Workman asked Hall if "you got someone we can .... you know?," which, given all the previous e-mails, Hall understood to mean Workman was looking to have sex with a child.[122]  Hall responded that a twelve–year–old girl might be available and asked Workman how he envisioned it going down and what was in it for him.[123]  Workman responded he wanted to "lick her little cunt then have her suck me, then cum inside her pussy."[124]  Hall responded, "Interesting.  Have any pics or

---

[117]State Record Vol. 5 of 12, Trial Transcript at p. 146, 2/26/14.

[118]Id., at p. 147.

[119]Id., at p. 148.

[120]Id., at p. 148.

[121]Id., at p. 150.

[122]State Record Vol. 5 of 12, Trial Transcript at p. 151, 2/26/14.

[123]Id. at p. 152.

[124]Id. at p. 153.

vids from other escapades like that?" to which Workman replied "Not on my own. Some a guy sent me. You have any?"[125] Hall said yes and asked Workman if he traded and his preference.[126] Workman sent an image of a clothed, young girl and, Hall, in an attempt to determine if the child was in danger, asked Workman if he had access to her, to which Workman responded, "I wish. You got a pic to share?"[127]

Hall testified that, by this point, the subpoena to Cox Communications for the IP address had been returned identifying Workman.[128] When Hall inquired as to what type of picture Workman wanted, Workman responded, "you got any fucking?"[129] Hall e-mailed Workman a video in a format that would not open.[130] Workman responded that he could not get the file to open, asked how he could watch it and sent Hall a picture of a minor white female standing nude facing away from camera on the phone.[131] Workman sent Hall several child pornographic images in later e-mails and all of the images were found on Workman's computer after it was seized.[132] After Hall mentioned that his

---

[125]Id. at pp. 155–56.

[126]State Record Vol. 5 of 12, Trial Transcript at p. 156, 2/26/14.

[127]Id. at pp. 158–60.

[128]Id. at p. 160.

[129]Id. at p. 162.

[130]Id. at pp. 156, 163–64.

[131]State Record Vol. 5 of 12, Trial Transcript at pp. 164–66, 2/26/14.

[132]Id. at pp. 166, 168, 172-174, 180-181 ,206.

girlfriend was leaving town but her children were staying behind, Workman responded, "I think I remember you saying you may has [sic] access to a 12 year-old."[133] Workman asked Hall, "You share?," to which Hall responded, "Videos?"[134] Workman responded, "Well, that too. I was talking about sharing the 12-year old."[135] Workman then started a new e-mail chain with a different subject header and asked Hall if he would "like to watch me fuck her?"[136] Workman then asked to set up a time.[137] They agreed on a Monday, April 9, 2012, and Hall provided Workman with an address of an apartment complex on Idaho Street.[138]

Hall, who was already staged with other law enforcement team members, communicated to them that Workman was en route to the meeting location.[139] When Workman was nearing the dead end on Idaho Street, Hall signaled the marked units to conduct a stop.[140] Hall and Zuppardo approached Workman's vehicle and told him they wanted to get him into an air-conditioned building, give him some water and an

---

[133]Id. at pp. 170, 172, 175.

[134]Id. at p. 176.

[135]Id.

[136]State Record Vol. 5 of 12, Trial Transcript at p. 177, 2/26/14.

[137]Id. at p. 178.

[138]Id. at pp. 184-188.

[139]Id. at pp. 188-189.

[140]Id. at p. 191.

opportunity for a bathroom break and then they would go over the reasons why he was stopped.[141]

When Hall and Zuppardo met with Workman at the station, Workman was advised of his <u>Miranda</u> rights.[142]  At the beginning of the interview, in an attempt to build rapport with Workman so he would be truthful, Hall let Workman know he knew things about him like that he played guitar and had a girlfriend named Renee.[143]  Hall testified that it was his practice to let suspects know that lying to a federal officer is a crime and that he advised Workman of the penalties.[144]  Hall testified that, initially, Workman was not forthcoming and admitted believing "Savage" was offering a twelve-year-old girl to have sex with him, but claimed his intent was to go to the residence to see if it was true and then call law enforcement.[145]  Workman also did not initially acknowledge sending child pornography.[146]  After Hall showed Workman some of the e-mails, Workman admitted to communicating with "Savage" after posting the Craig's List advertisement titled "Somebody's Daughter."[147]  He admitted sending six child pornographic photographs,

---

[141]State Record Vol. 6 of 12, Trial Transcript (con't) at p. 192, 2/26/14.

[142]<u>Id.</u> at p. 195.

[143]<u>Id.</u> at p. 194.

[144]<u>Id.</u> at pp. 195, 197, 230.

[145]<u>Id.</u> at p. 198.

[146]State Record Vol. 6 of 12, Trial Transcript (con't) at p. 199, 2/26/14.

[147]<u>Id.</u> at p. 203.

described them and admitted that one was a picture of his niece getting out of the shower.[148]  Workman told Hall that he had planned to have sex with the twelve-year-old "Savage" lived with; however, if he was impotent he would have left and done nothing else.[149]  Workman also told them about a man named Ron Anderson who had an eleven-year-old who Workman was trying to meet to have sex.[150]  At the conclusion of the interview, Workman said he wanted to veer away from becoming a pedophile and begged to be let go.[151]

Workman testified that he was researching human behavior on the internet.[152] Workman explained that he received chats from a sixty-year-old man in New Zealand using the moniker "Koala" who sent him icons which petitioner saved assuming they were pictures of women.  When he maximized the icons, he realized they were child pornography and deleted them.[153]  Workman claimed that when he was doing maintenance on his computer, he found that the photographs still existed and attempted to delete them again.[154]  Workman claimed he repeatedly deleted and restored the files

---

[148]Id. at pp. 205–06.

[149]Id. at pp. 201–07.

[150]Id. at pp. 208–09.

[151]Id. at p. 209.

[152]State Record Vol. 6 of 12, Trial Transcript at p. 27, 2/27/12.

[153]Id. at pp. 28–30.

[154]Id. at p. 29.

until he received a "file does not exist" message.[155]  He found the pictures again, renamed

them "Koala" and deleted them, again after which he believed they were gone.[156]

Workman testified that he posted a Craig's List advertisement about "Somebody's

Daughter," which he claimed was a saying from high school, as part of his behavioral

research.  He claimed that he intended to attract adults and specifically used the word

"woman" and never intended to attract a child.[157]  Workman testified that he received

"quite a few responses," including one from Ron Anderson who wanted him to "break

in " his eleven-year-old daughter.[158]  He also testified about a person named "Endavin"

whom he allowed to come to his home, and they talked about how his father forced him

and his sister to have sex.[159]  Workman claimed that after his communications with

Endavin and Ron Anderson, he was interested in finding the people victimizing the

children.[160]

Workman testified that "Savage" responded to his "Somebody's Daughter" post.[161]

Workman admitted he sent "Savage" a picture of a girl dressed in clothes and a girl on

---

[155]Id. at p. 30.

[156]Id. at pp. 30–31.

[157]Id. at pp. 32-33, 49–51.

[158]State Record Vol. 6 of 12, Trial Transcript at pp. 33, 57–58, 2/27/12.

[159]Id. at pp. 35–38.

[160]Id. at p. 42.

[161]Id. at 38–39.

a telephone, although he claimed he did so to see if "Savage" was familiar with Ron Anderson.[162]  Workman admitted that some of the pictures he sent "Savage" were the ones he received from Koala, but claimed that he accidentally sent the images to "Savage" and had no intent to distribute child pornography.[163]  He testified that he sent photographs of people he believed were adult women.[164]  Workman claimed he traveled to the Idaho Street location with the intention to see if it was a "real thing," confirm the address and call law enforcement personnel, but that he had no intent to have sex with a twelve-year-old.[165]  Workman testified that, when he was stopped by law enforcement officers, he tried to tell them about Ron Anderson and Endavin.[166]  He stated that during the interview, Hall told him at least twice that it was a crime to lie to a federal officer.[167]  Workman denied telling Hall that he was traveling to have sex with a twelve-year-old.[168]

Workman testified that he wrote a letter explaining what happened and included the names involved and sent it to his sister, who mailed it to television stations in New

---

[162]Id. at pp. 40, 48, 62, 68, 70.

[163]Id. at pp. 41, 45, 47, 75-76, 86, 96, 99.

[164]State Record Vol. 6 of 12, Trial Transcript at pp. 41, 47, 2/27/12.

[165]Id. at pp. 41–42, 99.

[166]Id. at pp. 42–43.

[167]Id. at pp. 43–44.

[168]Id. at pp. 44–45.

Orleans, Baton Rouge and Birmingham, Alabama, and to Child Services.[169]  He claimed

that, in response to his letter, he was interviewed by Detective Jason Rivard, and he gave

him all the information he knew about Ron Anderson.[170]

Workman testified that there were 148 images of little girls in thongs on his

computer because he allowed a friend to use his computer to do research.[171]  He claimed

that his friend's granddaughter was approached by a talent agent who wanted her to pose

for "some things,"[172] and they researched online by accessing several websites and

concluded the granddaughter should not accept the offer.[173]  Workman testified that he

did not save the pictures.[174]

Two lifelong friends of Workman, Danny Nichols and Fred Nance, both testified

that Workman was honest and had a reputation for wanting to help others.[175]

Based on the verdict, the jury apparently found that the State's evidence and

testimony were the more credible version of the facts and rejected Workman's claim of

---

[169]State Record Vol. 6 of 12, Trial Transcript at pp. 45, 47, 2/27/12.

[170]Id.

[171]Id. at pp. 63–65.

[172]Id. at p. 63.

[173]Id. at pp. 63–64.

[174]Id. at p. 64.

[175]Id. at 101, 106.

entrapment.[176]  Workman's argument in this regard is essentially that the jury should have believed his testimony.  In short, the trial record reflects a classic credibility contest in witness testimony, including the inferences to be drawn from and the weight to be assigned to the evidence.  These are functions the law assigns to the jury, which resolved Workman's assertions against him.  Jackson limits this court's review to the evidence before the trier of fact and does not allow this court to reassess the weight and credibility of the evidence.  See Jackson, 443 U.S. at 319 (finding that such matters are left to the factfinder).  Specifically, determination of the credibility of a witness is within the province of the jury and is not to be disturbed on habeas review.  Passman v. Blackburn, 652 F.2d 559, 569 (5th Cir. 1981) (that the jury chose to believe a witness whose credibility was challenged is not a question of constitutional dimensions); Holderfield v. Jones, 903 F.Supp. 1011, 1018 (5th Cir. 1995) (citing United States v. Hatch, 926 F.2d 387, 399 (5th Cir. 1991)) (The habeas court should defer to the jury's resolution of credibility determinations and justifiable inferences of fact.).  Thus, the jury's findings were reasonable and supported by the evidence and testimony.

Viewing the evidence in the light most favorable to the prosecution, I find that there was more than sufficient evidence upon which a rational trier of fact could have found that petitioner was not entrapped and that the essential elements of attempted

---

[176]The trial court instructed the jury regarding the defense of entrapment.  State Record Vol. 1 of 12, Criminal Jury Charges at pp. 6–7, 2/27/14.

aggravated rape and possession and distribution of child pornography were established. Because the state courts' rejection of Workman's insufficient evidence and entrapment claims is not an unreasonable application of Supreme Court precedent to the facts of this case, I find that Workman's claims are without merit and do not warrant federal habeas relief.

C.    INEFFECTIVE ASSISTANCE OF COUNSEL (CLAIM NOS. 4 & 5)

Workman asserts multiple claims of ineffective assistance of trial counsel.  He argues that trial counsel "failed to investigate, subpoena available expert witnesses and provide vital documents during and prior to trial."[177]  Workman also claims ineffective assistance of appellate counsel for failing to assign as error the introduction of other crimes consisting of erotic images into evidence.

Workman asserted these claims in his application for post-conviction relief.  The state trial court found Workman's claims of failure to investigate and to retain an expert in computer forensics speculative and conclusory.[178]  It found that Workman failed to show prejudice resulting from counsel's failure to provide him with essential reports.[179] The state trial court found Workman's claim of ineffective assistance of appellate counsel speculative and conclusory and, given the overwhelming evidence of his guilt, he failed

---

[177]Record Doc. No. 3-1 at p. 8.

[178]State Record Vol. 3 of 12, Trial Court Order at pp. 1-2, 2/1/17.

[179]Id. at p. 2.

to show that the appellate court would have overturned his conviction had the issue been raised on appeal.[180]

The Louisiana Fifth Circuit found no error or abuse of discretion in the state trial court's ruling that Workman failed to support his claims of ineffective assistance of trial counsel with anything other than speculation and conclusory allegations.[181]  As to his claim of ineffective assistance of appellate counsel, the Louisiana Fifth Circuit found that his claim was speculative and conclusory, especially given the overwhelming evidence of petitioner's guilt.[182]  The Louisiana Supreme Court denied relief, applying Strickland v. Washington, 466 U.S. 668 (1984).[183]

In Strickland, the United States Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel, requiring petitioner to prove both deficient performance and resulting prejudice.  Id. at 697.  The Supreme Court first held that "the defendant must show that counsel's representation fell below an objective standard of reasonableness."  Id. at 687–88.  Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result

---

[180]Id.

[181]State Record Vol. 8 of 12, 5th Cir. Order, 17-KH-134 at p. 1, 4/4/17.

[182]Id.

[183]State v. Workman, 255 So.3d 579 (La. 2018) (per curiam); State Record Vol. 10 of 12, La. S. Ct. Order, 17-KP-0716, 10/29/18.

of the proceeding would have been different." Id. at 694; United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999).

In deciding ineffective assistance of counsel claims, this court need not address both prongs of the conjunctive Strickland standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. Kimler, 167 F.3d at 893. A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.' . . . But it is not enough under Strickland, 'that the errors had some conceivable effect on the outcome of the proceeding.'" (citation omitted) Motley v. Collins, 18 F.3d 1223, 1226 (5th Cir. 1994) (quoting Strickland, 466 U.S. at 693); Harrington, 562 U.S. at 112 (Strickland requires a "substantial" likelihood of a different result, not just a "conceivable" one.)

On habeas review, the United States Supreme Court has clarified that, under Strickland, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." Harrington, 562 U.S. at 105. Harrington recognized the high level of deference owed to a state court's findings under Strickland in light of the AEDPA:

> The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is doubly so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under

§ 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.

<u>Harrington</u>, 562 U.S. at 105.

Thus, scrutiny of counsel's performance under § 2254(d) is "doubly deferential." <u>Cullen</u>, 563 U.S. at 190 (quoting <u>Knowles</u>, 556 U.S. at 123).  This court must therefore apply the "strong presumption" that counsel's strategy and defense tactics fall "within the wide range of reasonable professional assistance."  <u>Strickland</u>, 466 U.S. at 690.

Federal habeas courts presume that litigation strategy is objectively reasonable unless clearly proven otherwise by the petitioner.  <u>Id.</u>, 466 U.S. at 689; <u>Geiger v. Cain</u>, 540 F.3d 303, 309 (5th Cir. 2008); <u>Moore v. Johnson</u>, 194 F.3d 586, 591 (5th Cir. 1999). In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial.  <u>Strickland</u>, 466 U.S. at 689; <u>Neal</u>, 286 F.3d at 236–37; <u>Clark v. Johnson</u>, 227 F.3d 273, 282–83 (5th Cir. 2000), <u>cert. denied</u>, 531 U.S. 1167 (2001).  Tactical decisions, when supported by the circumstances, are objectively reasonable and do not amount to unconstitutionally deficient performance.  <u>Lamb v. Johnson</u>, 179 F.3d 352, 358 (5th Cir. 1999), <u>cert. denied</u>, 528 U.S. 1013 (1999) (citing <u>Rector v. Johnson</u>, 120 F.3d 551, 564 (5th Cir. 1997), and <u>Mann v. Scott</u>, 41 F.3d 968, 983–84 (5th Cir. 1994)).

The issue of ineffective assistance of counsel is a mixed question of law and fact. Clark v. Thaler, 673 F.3d 410, 416 (5th Cir. 2012); Woodfox, 609 F.3d at 789.  Thus, the question before this court is whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

(1)    Failure to Investigate and Subpoena Expert Witness to Testify

Workman claims that his trial counsel failed to hire an investigator to investigate the case and failed to call an expert witness, D. Wesley Attaway, who conducted a forensic analysis of Workman's computer hard drive, to testify at trial.

"'A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.'" Moawad v. Anderson, 143 F.3d 942, 948 (5th Cir. 1998) (emphasis added, citation omitted); accord Druery v. Thaler, 647 F.3d 535, 541 (5th Cir. 2011).  A petitioner cannot show prejudice as to a claim that his counsel failed to investigate without adducing what the investigation would have shown.  Diaz v. Quarterman, 239 F. App'x 886, 890 (5th Cir. 2007) (citing Strickland, 466 U.S. at 696, recognizing that some evidence is required to show that "the decision reached would reasonably likely have been different.").  To prevail on such a claim, petitioner must provide factual support showing what exculpatory evidence further investigation would have revealed.  Moawad, 143 F.3d at 948; Brown v. Dretke, 419 F.3d 365, 375 (5th Cir.

2005); Davis v. Cain, 2008 WL 5191912, at *10 (E.D. La. Dec. 11, 2008) (adopting referenced Report and Recommendation).

As an initial matter, Workman has failed to establish that counsel's investigation without an investigator was actually inadequate in any respect. In fact, he presented no evidence whatsoever as to what investigative steps counsel actually took or failed to take. Without such evidence, he cannot show that counsel performed deficiently. Netter v. Cain, 2016 WL 7157028, at *11 (E.D. La. Oct. 6, 2016), adopted, 2016 WL 7116070 (E.D. La. Dec. 7, 2016). Further, even if petitioner had made that showing, he would then have to prove that prejudice in fact resulted from the failure to hire an investigator. Workman has not shown that any beneficial information would have been revealed by further investigation; rather, his assertions are entirely speculative. Such bare speculation is not sufficient to meet his burden of proof. See Thomas v. Cain, 2009 WL 4799203, at *9 (E.D. La. Dec. 9, 2009).

As for Workman's claim relating to the failure to present the testimony of an expert witness, it is well settled that "'[c]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative.'" Graves v. Cockrell, 351 F.3d 143, 156 (5th Cir.2003) (quoting Buckelew v. United States, 575 F.2d 515, 521 (5th Cir.1978)); Bray v. Quarterman, 265 F. App'x 296, 298 (5th Cir.2008). To prevail on such a claim, the petitioner must name the witness, demonstrate that the

witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.  Day v. Quarterman, 566 F.3d 527, 538 (5th Cir.2009) (citing Bray, 265 F. App'x at 298).  These requirements apply to both expert and lay witnesses. Woodfox v. Cain, 609 F.3d 744, 808 (5th Cir. 2010).  The Fifth Circuit has "clarified that the seemingly technical requirements of affirmatively showing availability and willingness to testify '[are] not a matter of formalism.'"  Hooks v. Thaler, 394 F. App'x 79, 83 (5th Cir. 2010) (quoting Woodfox, 609 F.3d at 808).

Workman claims that Attaway could have testified that petitioner never shared child pornography peer to peer and could have also testified about the origins of the child erotica and "missing emails."  He further claims that Attaway would have explained the photographs were not from websites or search engines and that petitioner took steps to destroy them.  He claims Attaway would have explained how the photos could remain on the hard drive without Workman's knowledge and would have presented e-mails from Anderson and other e-mails with information of possible child exploitation, including e-mails in which "Savage" stated he was abusing his own daughter.

The record demonstrates that defense counsel obtained an order allowing an unnamed defense expert to access petitioner's computer hard drive and that discovery

was satisfied as of January 9, 2014.[184]  There is no evidence in the record, such as a report

or an affidavit from Attaway or any other defense expert, explaining any expert findings.

Workman offers only self-serving, speculative and conclusory allegations that the

proposed witness would have in fact testified and would have done so in a manner

consistent with Workman's version of the facts.  Therefore, petitioner has failed to meet

his burden of proof with respect to this claim.  See, e.g., United States v. Cockrell, 720

F.2d 1423, 1427 (5th Cir. 1983) (courts view "with great caution claims of ineffective

assistance of counsel when the only evidence of a missing witness's testimony is from

the defendant"); Buniff v. Cain, 2011 WL 2669277, at *3 (E.D. La. July 7, 2011);

Anthony v. Cain, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may

not speculate as to how such witnesses would have testified; rather, a petitioner must

come forward with evidence, such as affidavits from the uncalled witnesses, on that

issue."); Combs v. United States, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009)

("Unless the movant provides the court with affidavits, or similar matter, from the alleged

favorable witnesses suggesting what they would have testified to, claims of ineffective

assistance of counsel fail for lack of prejudice."); Harris v. Director, 2009 WL 1421171,

at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary

support) from the uncalled witness is fatal to the claim of ineffective assistance.").

---

[184]State Record Vol. 1 of 12, Order, 7/22/13; Minutes, 1/9/14.

Workman has failed to establish any deficiency or prejudice arising from his counsel's failure to hire an investigator or to call Attaway to testify.  The denial of relief on these issues was not contrary to or an unreasonable application of <u>Strickland</u>.

(2)    <u>Failure to Provide Workman with Discovery</u>

Workman claims his trial counsel was ineffective in failing to provide "vital documents during and prior to trial."[185]  He claims that he "was not provided with a copy of the search warrant, the subpoena to Cox Communications . . . the affidavits affirming the grounds to issue them" or his advice of rights forms.[186] Workman argues that he needed these documents to file a motion to suppress the evidence, which he claims was illegally obtained, to show that he was questioned before being advised of his <u>Miranda</u> rights and the charges against him and to prepare his defense.

The record reflects that Workman concedes that his trial counsel met with him on at least five occasions outside of the times they were present together at court proceedings.[187]  He also concedes that trial counsel provided him with discovery, except "the search warrant, affidavit for arrest, F.B.I. evidence sheets, and advice of rights form."[188] However, Workman was present at the suppression hearing when the advice of rights forms were shown to defense counsel before being admitted into evidence.[189]  At that hearing, defense counsel elicited testimony from Agent Hall that the Kenner Police

---

[185]Record Doc. No. 3-1 at p. 8.

[186]<u>Id.</u> at p. 17.

[187]State Record Vol. 3 of 12, Application for Post Conviction Relief (con't), Exh. 9 (Affidavit of Gary Workman, 9/12/16), 11/15/16.

[188]<u>Id.</u>

[189]State Record Vol. 5 of 12, Hearing Transcript at pp. 1, 9, 2/25/14.

Department placed Workman under arrest, but he was not advised of his rights until he arrived at the police department.[190]  Hall explained that Workman asked a question upon his arrest and that Hall told him that everything would be explained once they got him to an air-conditioned building and gave him water.[191]  According to Hall, that was the only communication before Workman was advised of his Miranda rights.[192]  The elapsed time between the traffic stop and when Workman was advised of his Miranda rights was less than one hour.[193]

The record further reflects that open file discovery was permitted and was "satisfied."[194]  The record demonstrates that defense counsel, who represented Workman for nearly two years, was fully familiar with the evidence and well-prepared for trial.  As discussed above, Workman's counsel filed a motion to suppress Workman's statement. While he did not file a motion to suppress other evidence, Workman has not demonstrated any basis to do so or a reasonable probability that such a motion would have been successful.  See Johnson v. Cockrell, 306 F.3d 249, 255 (5th Cir. 2002) (counsel is not required to make futile motions or frivolous objections); Smith v. Puckett,

---

[190]Id. at pp. 13–15.

[191]Id. at pp. 14–15.

[192]Id.

[193]State Record Vol. 5 of 12, Trial Transcript at p. 32, 2/26/14 (Zuppardo).

[194]State Record Vol. 1 of 12, Minutes, 1/9/14; Minutes, 2/24/14; State Record Vol. 3 of 12, Opening Statements Transcript at p. 10, 2/26/14; St. Rec. Vol. 6 of 12, Trial Transcript (con't) at p. 213, 2/26/14.

907 F.2d 581, 585 n.6 (5th Cir. 1990) ("Counsel is not deficient for, and prejudice does not issue from, failure to raise a legally meritless claim."); Koch v. Puckett, 907 F.2d 524, 530 (5th Cir. 1990) (concluding that "counsel is not required to make futile motions or objections.").

Furthermore, Workman has not shown that he was prejudiced by his trial counsel's alleged failure to provide him with documents. The state court record reflects that Workman's counsel vigorously challenged the State's evidence at trial and cross-examined the State's witnesses in great detail. Defense counsel presented the defenses of both entrapment and lack of intent. The fact that the jury did not accept either defense does not render counsel's performance constitutionally deficient. See Martinez v. Dretke, 99 F. App'x 538, 543 (5th Cir.2004) ("[A]n unsuccessful strategy does not necessarily indicate constitutionally deficient counsel."). "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689 (citations omitted).

Workman has not established that the state courts' denial of relief was contrary to or an unreasonable application of Strickland or its progeny. He is not entitled to relief on this claim.

(3)    Ineffective Assistance of Appellate Counsel

Workman claims that his appellate counsel was ineffective in failing to argue on appeal that the trial court permitted inadmissable "other crimes" evidence consisting of child erotica images to be admitted into evidence.

Agent Hall testified that he submitted the images found on Workman's computer to the National Center for Missing and Exploited Children and that some of the children in the photographs had been identified.[195]  When the prosecution attempted to show Hall State's Exhibit 33, the United States Department of Justice subpoena to Cox Communications,[196] defense counsel objected and argued that he had not been provided a copy in discovery and did not know the relevance of the evidence.[197]  The state trial court found that the document was not necessary and did not admit it into evidence.[198] In addressing State's Exhibit 18, the FTK-CD report of the examination of Workman's computer by Lawrence Robinson, Agent Hall testified that he tagged 184 images on Workman's computer that would not constitute child pornography but rather "erotica" due to the poses.[199]  Defense counsel did not object to that testimony or the introduction of the exhibit.[200]  When the prosecutor questioned Workman about the images, Workman

---

[195]State Record Vol. 6 of 12, Trial Transcript (con't) at pp. 211-212, 214, 2/26/14.

[196]State Record Vol. 1 of 12, Trial Minutes, 2/27/14; Exhibit Index Case #12-2204, undated.

[197]State Record Vol. 6 of 12, Trial Transcript (con't) at pp. 212-213, 2/26/14.

[198]State Record Vol. 6 of 12, Trial Transcript (con't) at p. 214, 2/26/14.

[199]Id. at p. 215.

[200]Id.; State Record Vol. 6 of 12, Trial Transcript at pp.15-17, 2/27/14

explained that he had helped a friend research a talent agency and that he told Agent Hall about his actions when he was arrested because he had "nothing to hide."[201]

Criminal defendants are entitled to effective assistance of counsel in their first appeal of right. Evitts v. Lucey, 469 U.S. 387, 394 (1985). The Strickland standard for judging performance of counsel also applies to claims of ineffective appellate counsel. Smith v. Robbins, 528 U.S. 259, 285 (2000); Goodwin v. Johnson, 132 F.3d 162, 170 (5th Cir. 1997). To prevail on a claim that appellate counsel was constitutionally ineffective, a petitioner must show that his appellate counsel unreasonably failed to discover and assert a nonfrivolous issue and establish a reasonable probability that he would have prevailed on this issue on appeal but for his counsel's deficient representation. Briseno v. Cockrell, 274 F.3d 204, 207 (5th Cir. 2001); Smith, 528 U.S. at 285–86.

Effective appellate counsel are not required to assert every nonfrivolous available ground for appeal. Green, 160 F.3d at 1043 (citing Evitts, 469 U.S. at 394). On the contrary, the United States Supreme Court has long recognized that appellate counsel filing a merits brief need not and should not argue every nonfrivolous claim; instead, appellate counsel may legitimately select from among them in the exercise of professional judgment to maximize the likelihood of success on appeal. Jones v. Barnes,

---

[201]State Record Vol. 6 of 12, Trial Transcript at pp. 63-65, 2/27/14

463 U.S. 745, 751–52 (1983).  Appellate counsel has the discretion to exclude even a nonfrivolous issue if that issue was unlikely to prevail.  See Anderson v. Quarterman, 204 F. App'x 402, 410 (5th Cir. 2006) ("The issues that Anderson argues his counsel should have raised on direct appeal ... lack merit.  As such, failure to raise these issues did not prejudice Anderson."); Penson v. Ohio, 488 U.S. 75, 83–84 (1988) (noting that courts have refused to find counsel ineffective when the proposed appellate issues are meritless); Kossie v. Thaler, 423 F. App'x 434, 437 (5th Cir. 2011) (recognizing the Supreme Court's basic rule that the presumption that appellate counsel was effective will be overcome only when the claims not asserted are stronger than those that were in fact raised).  Thus, because one of appellate counsel's important duties is to focus on those arguments that are most likely to succeed, counsel will not be found constitutionally ineffective for failure to assert every conceivable issue.  Smith, 528 U.S. at 288; Jones, 463 U.S. at 754.

Initially, since Exhibit 33 was not admitted into evidence, there was no basis for appellate counsel to argue its wrongful admission on appeal.  Such an argument would have wholly lacked merit.  Failing to raise a frivolous claim "does not cause counsel's performance to fall below an objective level of reasonableness."  Woods v. Johnson, 75 F.3d 1017, 1037 (5th Cir. 1996).  Thus, counsel's failure to assert it on direct appeal cannot be deemed either deficient performance or prejudicial since Workman has not demonstrated a reasonable probability that he would have prevailed on this issue.

80

As to Workman's claim that the evidence regarding the child erotica images found on his computer was not admissible, defense counsel did not object to the testimony or the admission of the related physical evidence. A contemporaneous objection would have been necessary to preserve error for review on direct appeal. La. Code Crim. P. art 841(A) ("An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence."). In the instant case, there was no contemporaneous objection. Without the claim being properly preserved for review on direct appeal, appellate counsel was not in a position to assert the claim on appeal; if it had been raised, the court of appeal would have rejected it as procedurally defaulted. Appellate counsel cannot be considered ineffective "in declining to raise an unreviewable issue." Givens v. Cockrell, 265 F.3d 306, 310 (5th Cir. 2001); accord Weatherspoon v. Cockrell, 2011 WL 4351397, at *34 (E.D. La. July 8, 2011) ("[A]ppellate counsel was precluded from raising this claim because there had been no contemporaneous objection at trial. Therefore, appellate counsel was not deficient for failing to raise the issue on appeal, and petitioner suffered no prejudice. Accordingly, petitioner's instant claim fails because he cannot show a reasonable probability that he would have prevailed on appeal if the issue had been raised.") (citations omitted), adopted, 2011 WL 4063611 (E.D. La. Sept. 13, 2011); Arceneaux v. Cain, 2009 WL 917429, at *10 (E.D. La. Mar. 31, 2009) ("Where appellate review of a claim would be barred due to the absence of a contemporaneous objection, appellate counsel is not ineffective for failing to assert the claim."); Taylor v.

Holliday, 2008 WL 5146505, at *8 (E.D. La. Dec. 4, 2008) (petitioner failed to demonstrate ineffective assistance of appellate counsel when issue was not preserved for appeal.).

The state courts' denial of relief on this claim was not contrary to or an unreasonable application of Supreme Court precedent. Workman is not entitled to relief on this claim.

## RECOMMENDATION

For the foregoing reasons, it is **RECOMMENDED** that Workman's petition for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[202]

---

[202]Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.

New Orleans, Louisiana, this _____6th_____ day of September, 2019.

_____

JOSEPH C. WILKINSON, JR.

UNITED STATES MAGISTRATE JUDGE